JAMES W. SYMINGTON AND SYLVIA S. SYMINGTON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12523-83.       Filed October 29, 1986.

---

*Reuben B. Robertson, Arthur K. Mason,* and *Raymond J. Sherbill,* for the petitioners.

*Ronald D. Pinsky,* for the respondent.

OPINION

TANNENWALD, *Judge*: Respondent determined a deficiency of $24,547.47 in petitioners' Federal income tax for the taxable year ended December 31, 1979. After concessions, the sole issue for decision is what was the fair market value, on October 9, 1979, of an open-space easement which petitioners donated to the Virginia Outdoors Foundation. For reasons of convenience, we have combined our findings of fact and opinion.

Some of the facts have been stipulated and are so found. This reference incorporates the stipulation of facts and attached exhibits.

Petitioners are husband and wife and resided in Washington, D.C., at the time they filed their petition in this case. They timely filed a joint Federal income tax return for the taxable year ended December 31, 1979, with the Internal Revenue Service Center, Philadelphia, Pennsylvania.

From about March 1975 until the present time, petitioners have been the fee simple owners of an approximately 61.3270-acre tract of land known as Friendship Farm which is located in Scott District, Fauquier County, Virginia.

By deed, dated October 9, 1979, petitioners conveyed to the Virginia Outdoors Foundation (Foundation) an open-space easement in gross over Friendship Farm, including the right in perpetuity to restrict the use, development, and subdivision of Friendship Farm (the easement gift). The deed specifically provided, in relevant part, that:

3. The property shall not be subdivided in any manner.

\* \* \* \* \* \* \*

6. No building, structure, or mobile home shall be built or maintained on the property other than (i) farm buildings or structures, and (ii) a single-family dwelling and outbuildings commonly or appropriately incidental thereto, including garaging, swimming pool, guest houses, servants' quarters and farm laborers' quarters.[1]

---

[1]The deed of gift contained several other restrictions dealing with accumulation of trash etc., display of billboards etc., management of timber, grading etc., and industrial or commercial

The easement gift is legally valid in accordance with the terms thereof and is binding on petitioners and "their heirs, successors and assigns." Petitioners did not receive consideration from the Foundation for the easement gift.[2]

During all relevant periods, the Foundation was an organization described in section 170(c)(2).[3] It was created by an Act of the General Assembly of the Commonwealth of Virginia to promote the preservation of open-space lands.

Friendship Farm is located in the Middleburg Area of Virginia which is widely regarded as a wealthy and prestigious section of Virginia containing many large country estates. The subject property lies on the easterly side of Virginia Route 709 ("Zulla Road"), approximately 4 miles south of the town of Middleburg, and approximately 43 miles due west of Washington, D.C. Zulla Road is a paved public street maintained by the Virginia Department of Highways and Transportation.

As of October 9, 1979, Friendship Farm was improved by a three-bedroom dwelling, a woodshed, guest cottage, swimming pool, equipment shed, three frame barns, and another frame building. The donation of the easement did not affect the value of the improvements on the subject property, which the parties have agreed was $175,000 as of late 1979.[4]

Fauquier County assessed the value of Friendship Farm for real estate tax purposes before and after the easement gift as follows:

|  | 1979 | 1980 |
| --- | --- | --- |
| Land (market value) | $177,840 | $145,480 |
| Improvements | 97,360 | 97,360 |

Section 1.170A-1(c)(1), Income Tax Regs., provides, in relevant part, that "If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the

---

activities except farming. Neither party has focused on the effect of such restrictions on the value of the easement gift.

[2]We note that respondent reserved the right to argue that petitioners did in fact receive consideration for their donation of the easement. However, we conclude that there is nothing in the record to support such a finding, nor does respondent make such argument on brief.

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[4]Accordingly, unless otherwise noted, all references hereinafter made to the value of Friendship Farm refer only to its land.

contribution." Fair market value, as defined by the regulations, "is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.

Unfortunately, since most open-space easements are granted by deed of gift there is rarely an established market from which to derive the fair market value. See, e.g., *Thayer v. Commissioner*, T.C. Memo. 1977-370; see also *Hilborn v. Commissioner*, 85 T.C. 677, 688 (1985) (valuation of facade easement). Accordingly, it is usually necessary to value such an easement by applying a "before and after" analysis, i.e., a comparison of the fair market value of the property before the conveyance of the easement with the fair market value of the property after it is encumbered, with any diminution of value to be ascribed to the fair market value of the easement itself. See *Stanley Works and Subsidiaries v. Commissioner*, 87 T.C. 389 (1986); *Hilborn v. Commissioner*, supra at 688; *Akers v. Commissioner*, T.C. Memo. 1984-490, affd. 799 F.2d. 243 (6th Cir. 1986); *Thayer v. Commissioner*, supra. The parties have agreed that the "before and after" approach is the proper way to value the instant easement gift.[5]

We initially focus on the second part of the equation, i.e., ascertaining the fair market value of Friendship Farm after it was encumbered by the open-space easement. This exercise requires little deliberation, for the parties not only agree that the highest and best use of the property after the easement gift was as a country estate, but their respective experts are in almost total agreement as to the value of the land as such an estate. Petitioners' expert, Edward Wright (Mr. Wright), placed Friendship Farm's after value at $200,000, while respondent's experts, Peter Moholt (Mr. Moholt) and John Davidson (Mr. Davidson), estimated the property's value to be $204,000 and $202,379, respectively. Given the very narrow range of differences, we think it appropriate to find that the after-gift value of

---

[5]This method has been approved by the Internal Revenue Service, see Rev. Rul. 73-339, 1973-2 C.B. 68, as clarified by Rev. Rul. 76-376, 1976-2 C.B. 53, and endorsed by Congress in connection with the adoption of the Tax Treatment Extension Act of 1980, see S. Rept. 96-1007 (1980), 1980-2 C.B. 599, 606.

Friendship Farm was $202,000. We now turn to the only remaining issue in the case, namely, the value of Friendship Farm prior to the easement gift.

The fair market value of property, by definition, should reflect the highest and best use to which such property could be put on the date of valuation. See *Stanley Works and Subsidiaries v. Commissioner, supra* at 400. The issue is one of fact based on the entire record (*Skripak v. Commissioner*, 84 T.C. 285, 320 (1985)), and the burden of proof as to this value is on petitioners. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111 (1933).

Respondent, citing language used by petitioners' expert, Mr. Wright, defines highest and best use as the "reasonable and probable use that supports the highest present value," and urges us to find, in light of the prevalent community attitude in the Middleburg Area in 1979 against subdivision which was reflected in the then contemplated and later adopted changes in the Fauquier County zoning ordinance, that subdivision was not such a "probable use." Instead, respondent contends that the highest and best use of Friendship Farm, even before the easement gift, was as a country estate, and that the granting of the easement thus resulted in no loss in market value. In the alternative, respondent asks us to find that, even assuming arguendo that subdivision was a probable use, it was still not the property's highest and best use, because, according to respondent, the price a developer would have been willing to pay for Friendship Farm was actually less than if it was sold as a country estate (i.e., $90,722 as compared to $202,379). Petitioners, on the other hand, argue that the highest and best use of Friendship Farm before the easement gift was as a subdivided property worth $350,000 to a developer, and that the granting of the easement therefore resulted in a substantial loss in market value. Thus, our inquiry must focus first on whether subdivision was a "probable use" at all, and if so, whether it was the property's "highest and best use" so as to support the highest fair market value for Friendship Farm.

In determining the fair market value of property "The realistic, objective potential uses for property control the valuation thereof." *Stanley Works and Subsidiaries v.*

*Commissioner, supra* at 400. See also *Olson v. United States*, 292 U.S. 246, 255-256 (1934). Thus, in determining the "reasonable and probable use that supports the highest present value" (see p. 896 *supra*), we focus on "The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future." *Olson v. United States, supra* at 255. Moreover, "The fair market value of property is not affected by whether the owner actually has put the property to its highest and best use" (*Stanley Works and Subsidiaries v. Commissioner, supra* at 400; see also *United States v. Meadow Brook Club*, 259 F.2d 41, 45 (2d Cir. 1958)), nor whether he ever intends to do so (*Akers v. Commissioner, supra*). Similarly, as long as the highest and best use is not prohibited by law (see *United States v. Meadow Brook Club, supra* at 45), community opposition to such a use does not preclude us from valuing property as if it were so used.[6]

In late 1979, at the time of the easement gift, the zoning and subdivision ordinances in Fauquier County would have permitted the subdivision of Friendship Farm. Petitioners submitted into evidence a hypothetical record plat which depicted a subdivision of Friendship Farm into 10 individual homesites. Richard McNear, who had been the director of planning and zoning of Fauquier County since 1972, testified at trial that the "plat met the requirements of the subdivision ordinance in effect in '79 and would have to have been approved by the [County] Board [of Supervisors] and committed to record. The subdivision process is a ministerial function, not a legislative [one]." Moreover, Mr. McNear added that a developer could have sought and obtained such approval "until May 19, 1981, which is when the new zoning ordinance was official [sic] adopted." Thus, at the time of the easement gift, petitioners had an unqualified legal right to subdivide Friendship Farm. Accordingly, we now turn to the issue of the fair market value of Friendship Farm as a subdivided parcel of land.

First, some general observations. While we agree with respondent that Mr. Wright's before-gift valuation was

---

[6]We recognize that such community opposition, as well as the impending zoning changes, might well have impacted on the ultimate purchase price Friendship Farm would have brought on the open market, see p. 898 *infra*. However, such considerations go to the fair market value of the property as a subdivision, not whether subdivision itself was a "probable use."

excessive, we reject Mr. Davidson's conclusion that the conveyance of the open-space easement had no adverse effect on the fair market value of Friendship Farm and that the property could not have commanded a higher purchase price absent the encumbrance. Not only did the easement prohibit any subdivision of Friendship Farm, but it also restricted the future construction of any additional dwellings on the land (see p. 893, *supra*), effectively "locking in" all future owners of the property. Thus, even assuming that in October 1979 there was no demand in the Middleburg Area for a 10-homesite subdivision, we are hard pressed to imagine a prospective purchaser of a 60-plus acre parcel of land who would not have considered the restrictions of such an open-space easement in determining his offering price. The fact that a purchaser of Friendship Farm would have been precluded from even giving away part of his land if he ever so desired, for example, to his children, or, along the same lines, precluded from ever building an additional home on his property, would certainly have affected the purchase price he would have been willing to pay.[7]

We also note that, despite the acknowledged community attitude against subdivision, there was a ready demand for smaller, individual lots in the Middleburg Area in 1979. Even Mr. Moholt and Mr. Davidson admitted as much at trial. Moreover, while it can be argued, in light of the added risks stemming from the uncertainty surrounding the impending zoning changes which were the subject of much public debate in late 1979, that a developer might have insisted on paying less for the property, this argument cuts both ways; for it is equally likely that a developer might well have paid a higher price for the opportunity to get in "under the wire" and secure approval of a record plat prior to the proposed changes, in order to be able to market his subdivision as the last, or at least one of the last, such developments available in the Middleburg Area.

Both Mr. Wright and Mr. Davidson[8] based their respec-

---

[7] We note that Mr. Moholt concluded that, even absent subdivision, i.e., as a country estate, the easement would have resulted in a decrease in market value equal to $11,000.

[8] Although we have considered Mr. Moholt's report with respect to the property's value as a country estate after the easement gift (see p. 895 *supra*), we have disregarded his valuation analysis with respect to the before-gift value of Friendship Farm as a subdivision, since his study failed to consider subdivision as a probable use.

tive subdivision analyses on the assumption that a developer would purchase the land and subdivide the property.[9] In arriving at their opinions of fair market value, each expert first determined what he considered to be the value of the land on the retail market, i.e., the per-acre price that a willing buyer, desiring a small homesite tract in the Middleburg Area, would have paid a developer for an already subdivided piece of land. Mr. Wright determined this average per-acre price to be $8,462.83 (total price $519,000), while Mr. Davidson determined a $3,295.04 per-acre figure (total price $202,075). These gross figures were then reduced to account for the costs of development, including sales commissions and the developer's profit margin. The gross figures were further adjusted by a 15-percent annual discount figure to account for the length of the period deemed necessary to sell all of the homesites.[10] The bottom line figure after these adjustments, $350,000 for Mr. Wright and $90,722 for Mr. Davidson, reflected each expert's opinion of what a developer would have paid for Friendship Farm.

---

[9]Although Mr. Wright and Mr. Davidson assumed, for purposes of their analyses, that the property could be subdivided into 10 and 9 homesites, respectively, after careful consideration of the various drainage experts' reports and the testimony offered at trial, we are inclined to accept as more persuasive than those of the other experts, the testimony of respondent's expert Mr. Hencken that the soil conditions on Friendship Farm would have permitted construction of perhaps only 3 to 5 homes on the property, in addition to the existing homesite.

We recognize that, since this would have resulted in an increase in the average size of each subdivided lot, it could be argued that the per-acre retail price a developer could have commanded on the open market might, in turn, have decreased. However, it is also entirely possible that, in reconfiguring the record plat to account for this reduction in total homesites, a developer could have combined the interior lots found on the old subdivision plat with those located on Zulla Road, thus resulting in lots all with Zulla Road frontage. This would likely have increased the value of the interior acreage. Moreover, in such a situation, a substantial portion of the development costs associated with providing access to the interior lots would have been eliminated. Although we recognize the difficulties of applying judicial expertise to such a highly technical problem (see *Thayer v. Commissioner*, T.C. Memo. 1977-370), in light of all these factors, we are of the opinion that Mr. Hencken's findings would not have had any substantial effect on the average per-acre price of Friendship Farm. In this connection, we note that none of respondent's expert witnesses quantified the effect of a lesser number of homesites which they claimed would be available upon a subdivision of Friendship Farm.

[10]The appraisal difficulties which arise when dealing with long sell-out periods, which are subject to the risks of market fluctuations, are minimized in the instant case given the relatively short period of time the experts assumed would be necessary to sell out the Friendship Farm subdivision (2 to 3 years depending on which report is relied upon). Compare *Akers v. Commissioner*, 799 F.2d 243 (6th Cir. 1986), affg. a Memorandum Opinion of this Court (16-year sell-out period). We have determined that the sell-out period in this case would be 2 years with an average discount of 15 percent over that entire period, since we conclude that it was likely that sales of lots would be more or less evenly distributed over the 2-year period.

To determine the retail value of the subject property, each expert utilized a valuation method commonly referred to as the market data or comparable sales approach. As its name implies, this valuation technique requires the appraiser first to examine sale prices of comparable properties in the same general geographic area and then to adjust these comparable sales by such factors as time, location, and physical characteristics, to name but a few, so as to arrive at the value of the subject property. Under ideal circumstances, such as is the case with a tract development where there is an abundance of truly comparable sales made under similar conditions, only minor adjustments are required and the value is easily derived. However, as in the instant case, when such conditions do not exist and the appraiser is forced to compare what are essentially noncomparable sales of property (which, to a large extent, is the situation in this case), many factors come into play and more adjustments are required. As might be expected, this results in a more subjective value, highly dependent on the independent judgment of the individual appraiser. Accordingly, we think it useful to point out those distinctive characteristics of Friendship Farm, gleaned from both the record and the Court's observations,[11] which have influenced our decision herein.

The property has the general shape of a right triangle, with its longest side fronting Zulla Road (approximately 3,093 feet), which is considered one of the most prestigious addresses in the Middleburg Area. This extensive frontage on Zulla Road, coupled with the property's gentle sloping topography which affords excellent views of the Bull Run mountains to the east and the Blue Ridge mountains to the west, makes Friendship Farm an ideal subject for subdivision. Moreover, on the western side of Zulla Road, directly across from Friendship Farm, lies a 121-acre piece of property known as Salamander Farm. Prior to 1979, a perpetual open-space easement was placed upon this property (Salamander easement) and donated to the Virginia Outdoors Foundation. The easement restricted subdivision of Salamander Farm into no more than 2 tracts of land,

---

[11]The trial judge was invited to make a personal inspection and did so, accompanied by counsel for the parties.

neither of which shall consist of less than 50 acres. The building restrictions contained in the Salamander easement are identical to those found in petitioners' deed of easement (see p. 893 *supra*), except that, in the event of subdivision, they would apply to each of the subdivided parcels. Thus, the easement effectively guarantees to any future owners of Friendship Farm not only an unobstructed western view of the Blue Ridge mountains into perpetuity,[12] but equally importantly, that no major subdivision development will ever occur across the road. In either instance, the existence of the easement was a valuable selling point which would have enhanced the value of the subject property. Congress has recognized that such an impact of a conservation easement may be taken into account. See S. Rept. 96-1007 (1980), 1980-2 C.B. 599, 606.

Keeping the foregoing characteristics in mind, we conclude that Mr. Wright's presentation constituted a more comprehensive and better overall analysis of the potential value of Friendship Farm as a subdivision. We think he used good judgment in choosing his comparable sales (he focused on sales of smaller tracts approximate in size to the proposed homesite lots found on the record plat[13]), and, notwithstanding the fact that some of his adjustments were clearly too large, we think he correctly seized upon the distinctive characteristics of Friendship Farm in making his adjustments. Moreover, Mr. Wright, as compared to Mr. Davidson, performed his appraisal with a constant eye towards what was properly the basic underlying assumption

---

[12]Respondent argues that Mr. Davidson correctly ignored the Salamander easement in making his adjustments, in light of the fact that, even under the terms of the easement, an owner of Salamander Farm could construct a dwelling or plant a row of tall trees up close to Zulla Road, thus blocking the view to be enjoyed by any future homeowners of Friendship Farm. We think it highly unlikely that a property owner of a 50-acre-plus parcel of land would opt to locate his home virtually on top of the main road (in fact, the existing home was set far back on the property) or desire to destroy his own expansive view to the east by planting tall, obstructive trees.

[13]We recognize that many large acreage sales were also discussed at trial and several were acknowledged by the experts to be fairly "comparable" to the subject property. However, these sales would only have significance as comparables if we were engaging in an analysis of the value of Friendship Farm as a country estate, and in fact were only evaluated in the expert reports with respect to that type of analysis. Therefore, while we have utilized this testimony in categorizing the types of adjustments to be considered in arriving at the estimated value of the subject property under the comparable sales approach (e.g., the effect of being located on Zulla Road), we have not otherwise viewed them as persuasive indications of the value of Friendship Farm as a subdivided property.

of such a study—the potential subdivision of Friendship Farm.

Mr. Davidson, on the other hand, failed to give subdivision use the careful attention we think it deserved. We were unable to determine by what method he arrived at the retail price per acre used as the basis of his valuation conclusions, because he failed to correlate the list of more than 70 allegedly comparable sales contained in his report. Nor did his testimony at trial afford the Court sufficient meaningful clarification. Not only did Mr. Davidson give no indication as to the weight he placed on each of these sales or as to what adjustments he made, but most of these sales involved lots in subdivisions outside the Middleburg Area which were not at all comparable to Friendship Farm.[14] The inadequacy of his analysis becomes even more accentuated in light of his exhaustive study of allegedly comparable sales with respect to his discussion of the before-gift value of the property as a country estate. See note 13 *supra*. All in all, we found Mr. Davidson's analysis unconvincing. Accordingly, we have afforded it little weight, and have placed much greater emphasis on Mr. Wright's study. We note at this point that, although we have previously indicated that we are inclined toward accepting the more persuasive expert valuation (*Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 452 (1980)), we have also made it clear that we are not required to accord such valuation total acceptance (*Parker v. Commissioner*, 86 T.C. 547, 562 (1986)).

While we agree with Mr. Wright's underlying analysis, as we alluded to above, we think his upward adjustments were too large. The small acreage sales he focused upon in his report indicate a range in value from $4,000 to $5,600 per

---

[14]Moreover, based upon the evidence adduced at trial, we are of the opinion that the Zulla Hills subdivision, located on Zulla Road a few miles south of the subject property, was not comparable to the proposed subdivision of Friendship Farm. For example, the deed of each Zulla Hills' homesite required that no single or multistory home be built on any lot with less than 3,000 or 2,000 square feet of ground-level living space, respectively—homes much too large and costly to build given the land on which they were to be located. Accordingly, this had an adverse effect on the price per acre. Furthermore, Zulla Hills is located in a physical depression which deprives that property of the scenic views enjoyed by Friendship Farm. In view of the foregoing, we have given little weight to the sale of Zulla Hills lots in arriving at our determination of the before-gift value of Friendship Farm.

acre,[15] with his adjustments in large measure based on the $5,600 per-acre sale. To these figures Mr. Wright applied his adjustments so as to arrive at an average per-acre price exceeding $8,000, which we consider to be excessive. We think that Mr. Wright over-emphasized the significance of the $5,600 sale. Moreover, while we agree with his use of a 10-percent-per-annum adjustment over a 2-year period for appreciation (the time factor), we think he overadjusted for the distinguishing characteristics of Friendship Farm as well as for the additional adjustments for the characteristics of each of the 10 lots into which he thought the property could be subdivided. In light of the foregoing, as well as the possibilities of community opposition (see note 6 *supra*), and a somewhat lesser price per acre as the consequence of fewer lot sites being available (see note 9 *supra*), we have concluded that a price of $4,600 for comparable sales is a more appropriate figure. We adjust this figure upward for 20-percent appreciation and a further approximate 35 percent ajustment in the resulting figure for the distinguishing characteristics of Friendship Farm and the differing characteristics of the individual lots. The result is a $7,450 (rounded off) price per acre. After accounting for a 26-percent reduction for development costs[16] and a 15-percent discount for the time value of money (see note 10 *supra*), we

---

[15]These sales are summarized as follows:

| Date of sale | Size (in acres) | Price per acre |
|---|---|---|
| 1/78 | 10 | $4,000 |
| 10/77 | 6 | 4,167 |
| 10/77 | 5 | 5,600 |

Moreover, we note that in May 1980, Captain Brown, a neighboring landowner, and Mr. Symington each purchased a 3.374 acre tract of land adjacent to Friendship Farm from a Mrs. Tousignant, for $6,750 and $6,758 per acre, respectively. Mr. Symington and Captain Brown purchased this land so as to preclude Mrs. Tousignant from selling it as a single parcel to an outside purchaser intent on constructing a home on it. While we have not considered these to be truly comparable sales, in light of the circumstances under which they were purchased, they were arm's-length transactions, and we think that the purchase prices are at least indicative of the price per acre that the market would bear. We also note that these parcels were inferior to the subject property, in that they had ingress and egress problems, and no frontage on Zulla Road.

[16]In this regard, we have evaluated the differences between Mr. Wright's and Mr. Davidson's calculations of development costs and have concluded that Mr. Wright's overall calculation of approximately 26 percent is more persuasive than that of Mr. Davidson's, which ranges from 30 percent to 34 percent depending on the method of calculation.

In calculating these percentages, we have eliminated the $15,000 item for an interior road in light of our conclusion that such a road would probably not be needed with the reduction in the number of available homesites. See note 9 *supra*.

arrive at $4,800 (rounded off) per acre as the fair market value of Friendship Farm on October 9, 1979, or a total of $294,370. Subtracting $202,000 as the after-gift value (see p. 895 *supra*), the fair market value of the open-space easement donated to the Virginia Outdoors Foundation was $92,370.

One final word. We are appalled at the time and energy both the parties and the Court have had to expend in the course of trial and decision in this case. The foundation which produced this situation is one which, several years ago, caused us to comment as follows:

> Too often in valuation disputes the parties have convinced themselves of the unalterable correctness of their positions and have consequently failed successfully to conclude settlement negotiations—a process clearly more conducive to the proper disposition of disputes such as this. The result is an overzealous effort, during the course of the ensuing litigation, to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise and capable of resolution only by a Solomon-like pronouncement. * * * [*Messing v. Commissioner*, 48 T.C. 502, 512 (1967).]

See also *Buffalo Tool & Die Mfg. Co. v. Commissioner*, *supra* at 451-452.

Our approach has had a mixed application by the Circuit Courts of Appeal. Compare *Akers v. Commissioner*, 798 F.2d 894 (6th Cir. 1986), revg. and remanding a Memorandum Opinion of this Court ("the random walk approach") with *Commissioner v. Marshall*, 125 F.2d 943, 946 (2d Cir. 1942), revg. on other grounds 43 B.T.A. 99 (1940) (" 'value' involves * * * a guess, a prediction, a prophecy"). See also *Cannon v. Commissioner*, 533 F.2d 959 (5th Cir. 1976), affg. a Memorandum Opinion of this Court, and particularly Clark, J., dissenting at page 962. We have endeavored, in this opinion, to set forth the underpinnings for our ultimate determination so as to provide, in the event of an appeal, a "trail for the appellate court to follow" (see *Akers v. Commissioner*, 798 F.2d at 897), but we are constrained to note that, to a large degree, these underpinnings also reflect Solomon-like pronouncements, albeit at an earlier phase of decision. The bottom line is that we are more than ever convinced that valuation cases should be disposed of by the

parties by way of settlement or other procedures short of court proceedings.

*Decision will be entered under Rule 155.*