ALVIN H. CLEMENS AND BARBARA A. CLEMENS, ET AL., [1] Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent Clemens v. Commissioner
Docket Nos. 2077-89, 14711-89, 14712-89
United States Tax Court
T.C. Memo 1992-436; 1992 Tax Ct. Memo LEXIS 460; 64 T.C.M. (CCH) 351; August 3, 1992, Filed *460 Decisions will be entered under Rule 155. Held: Value of conservation easement determined; petitioners are not liable for increased interest or additions to tax. For Petitioners: Michael F. Beausang, Jr., and Bruce E. Brownstein. For Respondent: John A. Gaurnieri. WHITAKER
WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in, increased interest on, and additions to petitioners' Federal income tax as follows: Increased Interest
and Addition to Tax
Sec.
Sec.
Petitioner
Year
Deficiency 6621(c) [1]
6659
Clemens
1982
$ 36,286  --
$ 10,886.00
Moyer
1985
6,729  120% of
1,866.60
adjusted
rate
Moyer [2]
1986
22,832  120% of
6,849.60
adjusted
rate
*461 The issues for decision are: (1) The value of a land conservation easement donated by a partnership in which petitioners had an interest to an organization as described in section 501(c); [2] and (2) increased interest under section 6621(c) and additions to tax under section 6659. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference. Petitioners Alvin H. Clemens (Mr. Clemens) and Barbara A. Clemens (collectively the Clemens petitioners) resided in Phoenixville, Pennsylvania, when their petition was filed. Petitioner P. Glenn Moyer (Mr. Moyer) resided in King of Prussia, Pennsylvania, when the petitions in docket Nos. 14711-89 and 14712-89 were filed, and petitioner Susann E. Moyer (Mrs. Moyer) resided in Strafford, *462 Pennsylvania, when the petition in docket No. 14712-89 was filed. On or about March 7, 1979, Mr. Moyer and Mr. Clemens established a trust in the State of Massachusetts called the RCM Associates Trust (Trust). They were the cotrustees of the Trust. Concurrently with the formation of the Trust, Mr. Moyer and Mr. Clemens, along with Mr. Eike Reemtsma, formed a Pennsylvania general partnership called the RCM Associates Partnership (the Partnership), which was the sole beneficiary of the Trust. Under the terms of the Partnership Agreement, any tax deduction attributable to a charitable contribution of property by the Partnership was allocable in equal distributive shares to Mr. Moyer and Mr. Clemens. Also on or about March 7, 1979, the Trust purchased a tract of undeveloped land (the property) consisting of either 136 or approximately 140 acres [3] from the trustee in bankruptcy for Strock Enterprises, Inc., for $ 350,000. At the time that Mr. Moyer and Mr. Clemens purchased the property, a 49-lot subdivision plan (the Strock plan) was in effect for the property. The property is situated in the Town of Chilmark on the island of Martha's Vineyard, Massachusetts. It is generally *463 rectangular in shape and is bordered by Middle Road and the Tiasquam River to the north and Kings Highway to the south. Meeting House Road runs northwest through the property. The property had been designated on June 14, 1976, by the Martha's Vineyard Commission (Commission), a regional commission authorized by State law, as a "District of Critical Planning Concern". This designation meant that, in order to "protect the fragile historic, rural, and natural features of the District from the hazards of erosion, sedimentation, pollution from on-site sanitary disposal facilities, and visual intrusion", the Commission had established certain special guidelines for the property. These guidelines required the Town of Chilmark to adopt regulations which contained erosion and sedimentation controls, prohibited *464 construction of buildings on hilltops or near roads where they would be visible, and required that sanitary disposal facilities be at least 200 feet from the Tiasquam River or associated wetland vegetation. They provided further that: All subdivision and habitable structures shall require a special permit from the Board of Appeals. The Board shall grant a special permit only for proposals consistent with the underlying zoning. If the Board of Appeals finds that the proposed action of the applicant is consistent with the resource character of the District * * * and the goals of these Guidelines * * * the Board may grant a special permit without special stipulation. If, however, the Board finds the proposal inconsistent with the above, it may grant a special permit within the District only with the stipulation that no excavation, dredging or filling of land and no erection or expansion of a building or structure shall take place within ninety days of special permit approval unless in the intervening period a town meeting has acted upon a proposal for acquisition of part or all of the premises in question, or for acquisition of other rights over those premises. A local ordinance *465 limited the number of building permits that could be issued in a given year to one-tenth of all lots in the subdivision. Local law also required that for every 10 lots proposed for development at least 1 of those lots had to be set aside as "youth lots" for sale to lower income residents at a cost that was considerably below prevailing market price. The youth lots for the instant property were expected to be sold for approximately $ 10,000 each and to contain approximately 2 acres each. Local Chilmark zoning bylaws also required that, except for youth lots, all dwellings or structures erected had to have a minimum area of land of 3 acres and had to be set back at least 50 feet from the property line. Due to these minimum lot size requirements, which apparently were adopted after approval of the 49-lot Strock plan, it appears that the Strock plan was no longer in conformity with local zoning bylaws. Local zoning laws also referenced the Commission's designation of the instant property as a District of Critical Planning Concern, and mandated the more stringent requirements required by the Commission. On Skippack Pike Corp. (the Corporation) is a Pennsylvania business corporation *466 owned 50 percent each by Mr. Moyer and Mr. Clemens during the years 1979 through 1986. In July 1979 the Partnership initiated a project to develop the property as a residential subdivision of single family homes. Toward this end, the Trust on behalf of the Partnership entered into an agreement with the Corporation whereby the Corporation was to undertake the development in exchange for an option for the Corporation to purchase the property. The Vineyard Open Land Foundation (VOLF) was hired by the Corporation to design a plan for development of up to 22 building lots and at least 40 to 50 acres retained for conservation purposes to be donated to conservation organizations. During the taxable year 1982, VOLF was an organization as described in section 501(c). VOLF prepared a 23-lot subdivision plan (the 23-lot plan) which was submitted in accordance with local law to the Chilmark Planning Board (Planning Board) on May 21, 1980. Ronald H. Mechur (Mr. Mechur) was the Executive Director of VOLF and was the individual who prepared the 23-lot plan on behalf of VOLF. Mr. Mechur previously had been the Executive Director of the Commission from 1976 to 1979. The parties stipulated *467 that he was an expert in the area of land planning. VOLF billed the Corporation for its services rendered in preparing the 23-lot plan. Plans for proposed subdivisions of 10 lots or more must first be submitted to the local Planning Board, which suspends its approval process until the plan is approved by the regional Commission. On or about June 26, 1980, after a hearing, the Commission voted to accept the 23-lot plan and issued a favorable decision on the same date authorizing the Planning Board to issue appropriate development permits to implement the 23-lot plan. On or about September 10, 1980, the Planning Board approved the 23-lot plan. Immediate efforts were implemented for the planning and construction of roads, utilities, and septic systems. A Declaration of Restrictive Covenants (Covenants) encumbering portions of the property was filed on or about August 25, 1980. On or about June 3, 1981, Mr. Moyer and Mr. Clemens organized the Meeting House Road Association, which was to act as a homeowner's association for the subdivision. Contemplating a charitable donation of a conservation easement over that portion of the property encumbered by the covenants, Mr. Moyer in the *468 fall of 1981 hired the firm of Minot, DeBlois & Maddison, Inc. (Minot firm), to appraise the proposed donated property for tax purposes. Webster A. Collins of the Minot firm indicated that valuation of the proposed easement would involve a valuation of the property before the gift "with a maximum number of lots available utilizing conservation land to meet density requirements." In response thereto, Mr. Mechur devised a hypothetical plan containing 40 lots (the 40-lot appraisal plan). His letter of December 11, 1981, describing the 40-lot appraisal plan indicated that "representation of this appraisal plan as a formal development plan would involve many local obstacles. From a tax planning viewpoint, however, it is a valuable tool." He believed, however, that with a little "massaging" he would have been able to convince the local authorities to approve the 40-lot appraisal plan if it had been necessary to do so. He also believed that the 40-lot appraisal plan complied with local development ordinances and bylaws. It was his opinion that the 40-lot appraisal plan would have had no adverse effect on the groundwater quality and level. Mr. Mechur's 40-lot appraisal plan was incorporated *469 into an appraisal of the easement (Minot report), dated March 25, 1983, prepared by Edward K. Wadsworth, MAI, SRPA, Pamela S. McKinney, and Kathleen J. Losi, all of the Minot firm. The Minot report used the widely accepted "anticipated use" valuation technique, whereby the following steps are followed: . For both "before" and "after" conservation gift scenarios, the market is studied, and an overall plan reflecting the highest and best use for each scenario is derived therefrom. . From these plans, by comparison with the development and sale experience for similar types of property, gross sale proceeds for developed lots are projected. The sale proceeds reflect per-lot sales, anticipated absorption, and built-in factors for property appreciation. . From the gross sale proceeds projected for each of the "before" and "after" conservation scenarios are deducted respective development costs including: - Planning and design - Roadway construction - Utility installation - Administration and overhead - Legal and audit - Survey and testing - Sales and marketing - Finance and carry - Developer profit . The net available after all costs of creation *470 have been deducted for each of the "before" and "after" subdivision plans represents an annual net income imputable to the land. Applying a discount factor to account for the time-value concept of money results in a net present value for the land as generated by the anticipated use (development) methodology. . The final step in the valuation of the subject conservation easement involves the comparison of "before" and "after" restriction land values. The difference between these two land values reflects the value of development rights implicit in the donation of a partial conservation restriction. To determine the highest and best use of the property before the donation of the easement, the Minot report treated the parcel as being a 40-lot single-family subdivision with a value of $ 2,660,000. This 40-lot assumption is based upon Mr. Mechur's 40-lot appraisal plan. Subtracting from the "before" value the "after" value of $ 1,750,000 (based on a 24-lot development), the report concluded that the value of the easement in question in 1982 was $ 910,00. On December 15, 1982, the Trust donated to VOLF a Conservation Restriction-Easement (the easement), which provided that neither *471 Mr. Clemens nor Mr. Moyer nor their heirs, devisees, successors, or assigns could at any time develop the land subject to the easement, with a few limited exceptions which allowed for proper maintenance of the property. Percolation tests that had been performed during July and August 1980 for the Chilmark Board of Health prior to approval of the 23-lot plan indicated that septic systems could be successfully engineered for all of the proposed lots. Local law required that each lot had to have its own well before it could be sold, but attempts to dig wells on the various lots met with uneven success. Therefore, when most of the other necessary improvements were almost completed, on October 5, 1981, Mr. Mechur asked the Planning Board for permission to sell lots subject to a proposed covenant that "an approved water supply will be obtainable from a well which produces water of a quality and at a rate satisfactory to the Board of Health and the Planning Board". Expressing concern that it would "set an undesirable precedent" to allow wells to be drilled after sale of the lots, the Planning Board on October 7, 1981, denied Mr. Mechur's request. During 1982, Mr. Moyer and Mr. Clemens *472 hired L.W. Sawyer & Son, Inc., to drill wells in three locations, and two of the sites proved to be unsuccessful. Subsequent attempts by Mr. Moyer and Mr. Clemens during 1983 to convince the Planning Board to waive the one-well-per- lot requirement and approve a centralized well for all of the lots also were unsuccessful. During 1984 and 1985, Mr. Moyer contracted with Gervais Equipment, Inc., for the drilling of individual wells on each of the lots on the property,which appears to have been successful. Respondent's valuation expert, William E. Coyle, Jr., MAI, CRE, SREA (Mr. Coyle), of the real estate appraisal firm of William E. Coyle, Jr. and Associates of Rhode Island, employed a "before and after" technique similar to that used in the Minot report. Mr. Coyle's report, however, indicates that "23 lots were the maximum number available under the regulations as of 1980", and that it was "highly unlikely that 40 lots would ever be approved." Accordingly, the report concludes that the easement had no value. As an alternate, Mr. Coyle's report further indicates that the "highest [before] number possible" might have been 30 lots, resulting in an alternate "before" value of $ 1,750,000, *473 which, after subtracting an "after" value of $ 1,400,000, results in an alternate value of $ 350,000. On their 1982 return, the Clemens petitioners took charitable contribution deductions which included in part a portion of the easement contribution at issue here, based upon a value of the easement at $ 910,000. Due to the limitations of section 170(b) upon certain charitable contributions, the Clemens petitioners did not utilize the full amount of their claimed $ 455,000 distributive share of the conservation easement for their taxable year 1982. They computed their 1982 contribution deduction on Schedule A of their 1982 return as follows: Contributions of Appreciated Property
RCM Associates (50% distributive share)
$ 455,000
Clemens & Clemens (50% distributive share)
18,000
Stock
17,937
Subtotal
490,937
Amount subject to deduction
(30% AGI limitation)
200,145
Plus cash contributions
5,750
Total deduction for 1982
205,895
Carryover to 1983
$ 290,792
The Clemens petitioners claimed the balance of their claimed contribution deduction attributable to their 50-percent distributive share of the contribution of the conservation easement on their *474 1983 and 1984 returns. They used the cash receipts and disbursements method of accounting in preparing their returns for the taxable years 1982 through 1984. Respondent on November 3, 1988, mailed to the Clemens petitioners a statutory notice of deficiency for 1982, which determined a deficiency in the amount of $ 36,286 and an addition to tax under section 6659 in the amount of $ 10,886. It determined that the Clemens petitioners' 50-percent distributive share of the conservation easement was limited to $ 55,000 (50 percent of $ 110,000) rather than $ 455,000 (50 percent of $ 910,000) as claimed on their return. The Clemens petitioners filed a timely petition with this Court on January 30, 1989. Mr. and Mrs. Moyer claimed the following amounts in connection with their 50 percent distributive share of the charitable contribution at issue here on Schedule A of their jointly filed 1982 through 1985 returns as well as Mr. Moyer's 1986 return: Taxable Year
Amount
1982
$ 39,580
1983
51,928
1984
18,939
1985
28,485
1986
114,162
Total amount of $ 455,000
claimed distributive share
$ 253,094
Mr. and Mrs. Moyer used the cash receipts and disbursements method of accounting *475 in preparing their returns for 1982 through 1986. On March 31, 1989, respondent issued two notices of deficiency, one of which determined a deficiency for 1985 owed by Mr. and Mrs. Moyer in the amount of $ 6,279, an addition to tax under section 6659 of $ 1,866.60, and increased interest under section 6621(c). The deficiency for 1986 was determined solely against Mr. Moyer in the amount of $ 22,832, with an addition to tax under section 6659 in the amount of $ 6,849.60, and increased interest under section 6621(c). The notices of deficiency issued to Mr. and Mrs. Moyer for the 2 years at issue here are a result of respondent's disallowance of their charitable contribution deductions resulting from the carryover of their 1982 50 percent distributive share of the charitable contribution in question. Timely petitions were filed by Mr. and Mrs. Moyer with regard to both years. OPINION The issues before the Court involve the value of the conservation easement granted by petitioners to VOLF in 1982, the additions to tax, and increased interest in connection with respondent's determination that the value of that easement shown on their returns was excessive. There are not contentions *476 in the record that the easements do not meet all the requirements for qualified conservation contributions; therefore, the only substantive issue that remains for decision is the value of the contribution. On their returns petitioners treated the easement in question as having a value of $ 910,000, which was applied by the Clemens petitioners to the tax year 1982 and by Mr. and Mrs. Moyer through carryovers to 1985 and 1986. In the notice of deficiency for the Clemens petitioners' 1982 tax year, respondent assigned a value of $ 110,000 to the easement in question, yet in these proceedings respondent's expert has taken the primary position that the easement had no value, with an "alternate" valuation of $ 350,000. Therefore, because respondent's present primary position would result in an "increase in deficiency" for the Clemens petitioners, petitioners have the burden of proving that the value of the easement exceeds $ 110,000, and respondent has the burden of proving that its value was less than that amount. Rule 142(a). Charitable contribution deductions are based upon the fair market value of the property at the time of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. *477 Fair market value is defined in the regulations as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2) Income Tax Regs.; see Symington v. Commissioner, 87 T.C. 892, 895 (1986). Where, as here, there is no comparable sales data upon which to base a determination of value, an accepted method of valuing an easement is by means of the "before and after" analysis, comparing the value of the entire property before the grant of the easement to the value of the remaining property after the grant, with the difference representing the value of the easement itself. Sec. 1.170A-14(h)(3)(iii), Income Tax Regs.; see Symington v. Commissioner, supra; Stanley Works v. Commissioner, 87 T.C. 389, 399 (1986); Hilborn v. Commissioner, 85 T.C. 677, 688 (1985). The fair market value of an easement is based upon the highest and best use of the property on the valuation date, and value is not affected by whether the actual owner actually has put the *478 property to its highest and best use. Realistic, objective potential uses control valuation. Stanley Works v. Commissioner, supra at 400. The parties' experts in this case presented appraisal reports which with regard to overall approach do not differ in any material respect. Both used the "before and after" approach. The principal difference between the appraisals involves the "before" part of the computation. The appraisers employed differing assumptions with regard to the number of lots into which the property could have been divided to achieve the "highest and best use". While respondent attempts to convince the Court that the qualifications of Ms. McKinney (who did most of the work on the Minot report and who testified on behalf of petitioners) are lacking, even if true it is irrelevant. Although when the Minot report was prepared in 1983 Ms. McKinney had not yet obtained her MAI designation, [4] she obviously possessed the training and experience to perform much of the work in preparing a well-organized, logical report. In addition, the first signature on the Minot report was that of Mr. Edward K. Wadsworth, who testified that he was Ms. McKinney's *479 supervisor when she worked on the report. Respondent asserted during trial that Ms. McKinney was not qualified to give an opinion on value because she essentially was still a student at the time of its preparation. However, Mr. Wadsworth (who was stipulated to be qualified to render an expert valuation opinion) testified that he approved of its methodologies, conclusions, and opinions. This judgment was confirmed by a member of another appraisal firm, Mr. John E. Kline, MAI, CRE, who did not testify but whose letter (which was admitted into evidence) indicated that the analysis of the Minot report was sound. We conclude that the methodology used in the Minot report appears to be well-recognized and sound. Accordingly, we hold that the Minot report is a reliable starting point for our determination of the value of the conservation easement. *480 Respondent did not object to the methodology used in the Minot report, but made some specific allegations of error, which we now address. The Minot report used Mr. Mechur's 40-lot appraisal plan to achieve a "before" number of $ 2,660,000. Mr. Mechur, who also testified, has indicated that he believed a 40-lot plan could have been approved, albeit with a little "massaging". Mr. Mechur is a former executive director of the regional Martha's Vineyard Commission, which would have had to approve such a plan if it had been presented for approval. Thus he has substantial experience in the approval process. He also was stipulated by the parties in this case to be an expert in land planning. Despite Mr. Mechur's qualifications, respondent urges us to place little credence in Mr. Mechur's testimony. In support thereof, respondent points to the fact that at the time he prepared the 40-lot appraisal plan Mr. Mechur was Executive Director of VOLF, which received the conservation easement from petitioners in 1982, that he devised the 23-lot plan actually submitted by petitioners and approved, and that VOLF was compensated therefor. However, there is no evidence in the record which would *481 lead us to suspect that Mr. Mechur is not telling the Court his perception of the truth when he stated that he believed a 40-lot plan could have been approved. He would stand to gain nothing from giving false testimony before this Court, and we will not presume dishonesty without good reason. Cf. Herzog v. United States, 226 F.2d 561, 566 (9th Cir. 1955), affd. on rehearing 235 F.2d 664 (9th Cir. 1956). In addition, Mr. Mechur's expertise in this area certainly exceeds that of any other witness on this crucial point. In his report, respondent's valuation expert, Mr. Coyle, indicated that it was his "considered opinion that there is little likelihood that 40 lots would be approved on this site." Mr. Coyle further indicated, with respect to his "primary" position that the conservation easement had no value, that the highest and best use of the property was as a 23-lot subdivision. Mr. Coyle is a professional appraiser with offices in Pawtucket, Rhode Island, and Seekonk, Massachusetts. There is no evidence in the record that Mr. Coyle has any experience either with this particular piece of property or more generally with the approval process *482 on Martha's Vineyard. Nor does he appear to have appraised any property on that island. He testified only that he developed his position by his walking of the site, flying the site, reviewing the plans, reviewing every document in the planning board office, reviewing most of the documents in the Martha's Vineyard Commission, and talking to members of the planning board, talking to members of the Martha's Vineyard Commission, talking to the building inspector, talking to the chairman of the zoning board of appeals at the time to get a general background, an idea of the actions and reactions of the various people in town in order to get a flavor of what the reasonable probability was to get more than the 23 lots on this plat * * *. While Mr. Coyle apparently did his homework in preparing his report, Mr. Mechur's experience with the approval process generally and with this case in particular put him in a much better position to make the determination of the likelihood of approval than Mr. Coyle. Respondent further supports Mr. Coyle's 23-lot "before" plan with the supposition that "the number of potential building lots actually proposed by petitioners for which approval was *483 in fact secured in 1980 represents the highest and best use of the subject property both before and after the easement gift." This presumption, however, flies in the face of the rule that value is not affected by the use to which the parties actually put the property. Stanley Works v. Commissioner, 87 T.C. at 400. In this case there is ample evidence that petitioners were interested in developing this parcel of land in a manner that may not have achieved the greatest profit but which adhered to their personal interests in protecting the remote flavor of the area. That they never actually submitted the 40-lot appraisal plan for approval is perfectly in keeping with that interest. With respect to Mr. Coyle's "alternative" analysis, he indicated that at the very most the highest and best use of the property would have been as a 30-lot subdivision. But for both the 23-lot and the 30-lot "before" proposals devised by Mr. Coyle, he relied upon the subdivision designs of an engineer who was not present to testify. We therefore have no way to determine whether these designs were predicated upon correct facts. Mr. Coyle also admitted that this engineer had no experience *484 in the subdivision planning and approval process on Martha's Vineyard. Nor has respondent indicated how the 40-lot appraisal plan violated any of the local regulations. Respondent admits that the minimum lot size density requirements were satisfied, but does not indicate which other regulations would have been violated by Mr. Mechur's plan. We find on balance that Mr. Mechur's expertise and experience in this area should cause us to place greater weight upon his conclusion that a 40-lot subdivision could have been approved than Mr. Coyle's conclusion that it could not. We conclude therefrom that a 40-lot subdivision was the highest and best use of this property before donation of the easement. We have held that the format used by the Minot report provides us with a useful framework for the Court's valuation of the easement based upon a discounted cash flow analysis. We agree with respondent, however, that certain portions of the Minot report are in error. There were a number of aspects of the "before" and "after" figures calculated in the report which inflated those figures to unjustifiably high levels. Therefore, we have applied the methodology used in the tables on pages *485 23 and 28 of the Minot report to redetermine the Court's "before" and "after" figures in appendices A and B, respectively, and we have made certain adjustments to account for the errors. First, with regard to the "before" figure, the Minot report did not take into account the local requirement that at least 1 in every 10 lots sold had to be sold as youth lots to young community members for a price that was expected to be approximately $ 10,000. This resulted in an overly inflated figure for total income in the Minot report. Our recomputation in appendix A employs the following reasoning: Of the approximately 135 acres of total acreage that would have been available for development in a 40-lot subdivision, approximately 8 acres would have been used for approximately 4 youth lots, leaving approximately 127 acres available for development of the 36 lots remaining in the 40-lot plan. This would have resulted in approximately 3.53 acres per lot for the "regular" lots rather than the 3.38 acres used in the Minot report (135 divided by 40) and would have resulted in substantially less income in year 5 than that reflected in the Minot report, as appendix A shows. [5]
*486 Second, the average price per acre used in the Minot report was $ 35,000, based upon Ms. McKinney's analysis of and adjustments to nearby comparable properties. Lots in the Tea Lane subdivision, which she identified as "most comparable" to the property, recently had sold for an average of approximately $ 35,000 per acre. Respondent did not convince the Court that reliance upon these lots as comparable property was unwarranted. Lots in the Parker subdivision, which contained waterfront, water view, and interior lots, sold for an average of approximately $ 20,000 to $ 25,000 per acre, but Ms. McKinney treated these lots as being less valuable than the instant property, even though those lots were located considerably closer to the water than the lots at issue. Ms. McKinney admitted on cross-examination that proximity to the water was an important reason for interest in any beach property, but concluded that the wooded nature of the property at issue in this case made it much more desirable than the Parker subdivision property, which was closer to the water but had no privacy. While we accept her judgment that privacy tends to increase the value of property, we also recognize that *487 people logically pay more money for lots located near the water than lots further away from the water. The magnitude of Ms. McKinney's adjustment for lack of privacy is particularly inappropriate where as a general rule lots very close to the ocean tend not to be as wooded as interior lots. We are inclined to agree with respondent's argument that a lot with a water view is likely to bring a higher price than an identical interior lot, which would offset some of the inherent value of the wooded character of the interior lot. [6] Accordingly, the adjustment in the Minot report to the lots in the Parker subdivision was excessive. A third subdivision used by the Minot report was the Spring Point subdivision, where interior lots were selling for an average of $ 20,000 to $ 25,000 per acre. The report indicated, however, that problems with this property's "reapproval process" rendered these lot prices below market. We assume this means that the owners of the Spring Point subdivision were experiencing difficulty in convincing local authorities to approve their subdivision plan. Respondent attempted at trial to discredit this distinction by arguing that the instant property would similarly *488 have faced "reapproval process" problems if a 40-lot development had been presented to the local authorities. However, this disregards the point repeatedly made by petitioners that if they had been interested in actually pursuing a 40-lot plan from the beginning they would not have presented the 23-lot plan and would have been operating from the previously approved 49-lot Strock plan. We conclude, therefore, that the Minot report's distinction between the Spring Point subdivision and the instant property is well taken. Based upon the foregoing, the correct per-acre figure to apply to our modified discounted cash flow analysis in the 40-lot layout is $ 32,000. [7]
*489 Third, Ms. McKinney admitted on cross-examination that in preparing the Minot report she did not take into account the fact that each lot was required to have a well prior to sale and that petitioners were experiencing some difficulty in locating successful wells on certain lots. Given what petitioners knew or did not know at the time of the easement gift, the uncertainty about being able to locate drinking water sources for each lot certainly affected the value of the property in their hands. However, because petitioners would not have been able to sell any lot until a successful well already was drilled, the risk would have been alleviated by the time of sale; thus the price of the lots would not have been lowered to account for this risk, and it would have to be taken into account in predicting the risk of well-drilling costs. [8]
*490 It is in the calculation of "hard costs" -- which includes the costs of drilling wells and installing electricity and telephone -- that adjustment to the Minot report needs to be made for this risk that water might be difficult to find for each lot. The report indicates "hard costs" in the 40-lot layout to be a total of $ 256,314, yet record evidence indicates the actual cost of drilling three wells prior to the date of the gift to be approximately $ 23,000, or approximately $ 7,500 per well. That figure multiplied by 40 wells would equal $ 300,000 for wells alone. Respondent's expert treated the cost of drilling wells as $ 6,400 per lot. Since the record does not adequately specify which portion of the "utility" figure in the Minot report was for wells and which was for installation of electric service, in appendix A we have made our best estimate and increased total utility costs to $ 7,000 per lot, or $ 280,000. Respondent also contends that the inclusion in the Minot report of an absorption rate of eight lots per year was inappropriate because no more than approximately 3.7 building permits could have been obtained per year. However, respondent's claim in this respect disregards *491 the fact that many potential purchasers could have purchased lots with the intention of building in future years; there was testimony to the effect that this is particularly common with vacation properties such as the instant property. Therefore, we do not feel that an assumption of sales of 8 lots per year was unjustified. Based upon the foregoing, we have made adjustments to the figures in the chart for the 40-lot layout of the Minot report to conclude that the correct value of the "before" figure is $ 2,025,000, as shown in appendix A. [9]
The parties' "after" figures were based upon their both treating the appropriate number of lots as 23 or 24. [10] Applying the same methodology as used in the chart for the 24-lot layout on page 28 of the Minot report, we have made adjustments in appendix B to account for the existence of 3 2-acre youth lots on the 80-acre parcel remaining *492 after donation of the easement. We also have adjusted the price-per-acre figure to $ 35,000, in keeping with our comments earlier, but also recognizing that, because of the open space on a significant portion of the property, the existence of the easement raised the potential sale price of the lots as compared with the price in the 40-lot "before" scenario. In addition we have adjusted the "hard" costs resulting from the $ 7,000 per-lot utility costs discussed above. As appendix B shows, the discounted "after" figure as adjusted by the Court is approximately $ 1,322,000. [11] Accordingly, the difference between the "before" and "after" amounts is $ 703,000, which is the value of the conservation easement as determined by the Court. *493 With regard to the additions to tax under section 6659 for both the Moyer and Clemens petitioners for all 3 years, that section provided during all years at issue that there is a "valuation overstatement" where "the value of any property, * * * claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation." In this case, the value claimed by petitioners pursuant to their appraisal was $ 910,000, and the correct value as determined by the Court is $ 703,000. The extent to which the value of the property donated was overstated by petitioners on their returns was approximately 129 percent, and a valuation overstatement within the definition of section 6659 was not present in this case. Accordingly, the imposition of additions to tax under section 6659 is not sustained. With regard to the imposition of increased interest under section 6621(c) in the notices of deficiency issued to Mr. and Mrs. Moyer for 1985 and 1986, the definition of a "tax motivated transaction" is keyed to the definition of a "valuation overstatement" in section 6659, as discussed above. Sec. 6621(c)(3)(A)(i). [12] Because there was no valuation overstatement, *494 the imposition of increased interest under section 6621(c) is not sustained. Decisions will be entered under Rule 155. APPENDIX A DISCOUNTED CASH-FLOW ANALYSIS 40-LOT LAYOUT MEETINGHOUSE ROAD SUBDIVISION CHILMARK, MARTHA'S VINEYARD U.S. TAX COURT MODIFICATION OF MINOT REPORT TABLE PAGE 23 YEAR
YEAR
YEAR
1
2
3
Income:
Lot sale proceeds
Average reg lot size (acres)
3.53
3.53
3.53
Average price/reg acre
32,000
32,000
32,000
Average price/reg lot
112,960
112,960
112,960
Average youth lot size (acres)
Average price/youth lot
Appreciation rate (12%)
1.00
1.12
1.25
Absorption (reg)
8
8
8
Absorption (youth)
Subtotal
903,680
1,012,122
1,133,577
Development loan advance
286,761
0
0
Total income
1,190,441
1,012,122
1,133,577
Expenses:
Hard costs
Planning/design
34,537
0
0
Roadway construction
85,454
0
0
Utility installation
280,000
0
0
Miscellaneous
0
0
0
Subtotal
399,991
0
0
Soft costs
Administration/overhead
5,000
5,000
5,000
Legal/audit
3,048
1,500
1,500
Survey/testing
30,447
0
0
Sales/marketing
94,640
105,997
118,716
Finance/carry
22,270
16,925
11,466
Miscellaneous
0
0
0
Subtotal
155,405
129,422
136,682
Developer profit
141,960
158,995
178,075
Total expenses
697,356
288,417
314,757
Net income:
493,085
723,705
818,820
Loan repayment:
69,914
68,823
68,823
Valuation:
Undiscounted cash flow
available for land
acquisition
423,171
654,882
749,997
Discounted value
367,975
495,185
493,135
Total discounted at 15.00%
=  $ 2,025,342   Call:
$ 2,025,000   *495 YEAR
YEAR
4
5
TOTAL
Income:
Lot sale proceeds
Average reg lot size (acres)
3.53
3.53
3.53
Average price/reg acre
32,000
32,000
32,000
Average price/reg lot
112,960
112,960
112,960
Average youth lot size (acres)
2
Average price/youth lot
10,000
10,000
Appreciation rate (12%)
1.40
1.57
Absorption (reg)
8
4
36
Absorption (youth)
4
4
Subtotal
1,269,606
750,979
5,069,964
Development loan advance
0
0
286,761
Total income
1,269,606
750,979
5,356,725
Expenses:
Hard costs
Planning/design
0
0
34,537
Roadway construction
0
0
85,454
Utility installation
0
0
280,000
Miscellaneous
0
0
0
Subtotal
0
0
399,991
Soft costs
Administration/overhead
5,000
5,000
25,000
Legal/audit
1,500
1,500
9,048
Survey/testing
0
0
30,447
Sales/marketing
132,962
148,918
601,233
Finance/carry
5,962
415
57,038
Miscellaneous
0
0
0
Subtotal
145,424
155,833
722,766
Developer profit
199,444
223,377
901,851
Total expenses
344,868
379,210
2,024,608
Net income:
924,738
371,769
3,332,117
Loan repayment:
68,823
10,379
286,762
Valuation:
Undiscounted cash flow
available for land
acquisition
855,915
361,390
3,045,355
Discounted value
489,372
179,675
2,025,342
Total discounted at 15.00%
Call:
*496 APPENDIX B DISCOUNTED CASH-FLOW ANALYSIS 24-LOT LAYOUT MEETINGHOUSE ROAD SUBDIVISION CHILMARK, MARTHA'S VINEYARD U.S. TAX COURT MODIFICATION OF MINOT REPORT TABLE PAGE 28 YEAR
YEAR
YEAR
1
2
3
Income:
Lot sale proceeds
Average reg lot size (acres)
3.52
3.52
3.52
Average youth lot size (acres)
2
Average price/reg acre
35,000
35,000
35,000
Average cash/reg lot
123,200
123,200
123,200
Average cash/youth lot
10,000
Appreciation rate (12%)
1.00
1.12
1.25
Absorption (reg)
8
8
5
Absorption (youth)
3
Subtotal
985,600
1,103,872
802,710
Development loan advance
194,679
0
0
Total income
1,180,279
1,103,872
802,710
Expenses:
Hard costs
Planning/design
34,537
0
0
Roadway construction
48,831
0
0
Utility installation
168,000
0
0
Miscellaneous
0
0
0
Subtotal
251,368
0
0
Soft costs
Administration/overhead
5,000
5,000
5,000
Legal/audit
3,048
1,500
1,500
Survey/testing
17,507
0
0
Sales/marketing
101,536
113,720
127,367
Finance/carry
14,120
7,977
1,577
Miscellaneous
0
0
0
Subtotal
141,211
128,197
135,424
Developer profit
152,304
170,580
191,050
Total expenses
544,883
298,777
326,474
Net income:
635,396
805,095
476,236
Loan repayment:
77,872
77,872
38,936
Valuation:
Undiscounted cash flow
available for land
acquisition
557,524
727,223
437,300
Discounted value
484,803
549,885
287,532
Total discounted at 15.00%
=  $ 1,322,220   Call:
$ 1,322,000   *497 YEAR
YEAR
4
5
TOTAL
Income:
Lot sale proceeds
Average reg lot size (acres)
3.53
Average youth lot size (acres)
2
Average price/reg acre
35,000
Average cash/reg lot
123,200
Average cash/youth lot
10,000
Appreciation rate (12%)
Absorption (reg)
21
Absorption (youth)
3
Subtotal
2,892,182
Development loan advance
194679
Total income
0
0
3,086,861
Expenses:
Hard costs
Planning/design
34,537
Roadway construction
48,831
Utility installation
168,000
Miscellaneous
0
Subtotal
251,368
Soft costs
Administration/overhead
15,000
Legal/audit
6,048
Survey/testing
17,507
Sales/marketing
342,623
Finance/carry
23,654
Miscellaneous
0
Subtotal
0
0
404,832
Developer profit
513,934
Total expenses
0
0
1,170,134
Net income:
0
0
1,916,727
Loan repayment:
0
0
1,916,727
Valuation:
Undiscounted cash flow
available for land
acquisition
1,722,047
Discounted value
1,322,220
Total discounted at 15.00%
Call:
*498 Footnotes
1. Cases of the following petitioners were consolidated herewith for purposes of trial on May 17, 1990: P. Glenn Moyer, docket No. 14711-89; and P. Glenn and Susann E. Moyer, docket No. 14712-89.↩
1. Sec. 6621(d) was amended and redesignated as sec. 6621(c) by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(d), 100 Stat. 2744. For convenience we refer to sec. 6621(c) in this opinion. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.
[2]↩ The deficiency for 1986 was determined against petitioner P. Glenn Moyer only. The other deficiencies were determined against petitioners Alvin H. and Barbara A. Clemens jointly and petitioners P. Glenn and Susann E. Moyer jointly.
3. The survey plan prepared in 1980 in connection with the property indicates that it consisted of 136 acres, although the Chilmark tax assessor's records listed the property as consisting of approximately 140.23 acres.↩
4. The acronym "MAI" stands for "Member of the Appraisal Institute." In order to obtain this designation, a person must pass a prescribed series of courses, prepare a demonstration report, pass a comprehensive examination, and have 5 years of appraisal experience.↩
5. In our calculation we have assumed that all four youth lots would have been sold in the fifth year for $ 40,000.↩
6. Respondent's expert, Mr. Coyle, indicated at trial that he used the same properties as used in the Minot report, but made different adjustments. We are unable to determine, however, from a review of Mr. Coyle's report, why he made all the adjustments he did. We only know that he believed waterfront lots to be more valuable than the lots on the property at issue. ↩
7. We note that the record contains a letter from Mr. Mechur to Mr. Moyer and Mr. Clemens indicating in August 1982 his opinion that "realistic" lot prices for the instant property were $ 85,000 for wooded lots and $ 105,000 for water view lots, which represents approximately $ 25,000 and $ 30,000 per acre, respectively. While we have accepted Mr. Mechur as a qualified land use planner in this proceeding, he was not presented as a valuation expert. Accordingly, we do not place any reliance upon this letter for our determination of the appropriate average price per acre.↩
8. Respondent undoubtedly would concede as much. Respondent's expert Mr. Coyle indicated in his testimony that he assumed in his 30-lot alternative valuation that wells could be successfully achieved on all 30 lots because "You would have to do that in order to sell them. That's a requirement."↩
9. We note that this figure lies between petitioners' "before" figure of $ 2,660,000 and respondent's alternate "before" figure of $ 1,750,000.↩
10. Petitioners in their brief point out that at times the "after" plan is referred to as a 23-lot plan and at other times as a 24-lot plan. They explain that the reason for this is that the development as actually approved was to contain 23 lots for sale and a 24th lot to be set aside for common recreational use. In our analysis in Appendix B, for convenience we follow the methodology of the Minot report and use 24 lots. ↩
11. This figure is below both petitioners' "after" figure of $ 1,750,000 and respondent's alternate "after" figure of $ 1,400,000.↩
12. Respondent does not allege in respondent's brief or elsewhere that the donation of the charitable contribution at issue here constituted a "sham or fraudulent transaction" within the meaning of sec. 6621(c)(3)(A)(v)↩. Nor do we believe that the record could support the finding of a sham here.