T.C. Memo. 1998-412


UNITED STATES TAX COURT


JOHN T. TALKINGTON AND MARGARET K. TALKINGTON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

HENRY A. SESSIONS AND BARBARA SESSIONS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 19315-96, 19321-96.      Filed November 16, 1998.


<u>William Norton Baker</u> and <u>J. Mark Wagnon</u>, for petitioners.

<u>George E. Gasper</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined deficiencies in

petitioners' Federal income taxes as follows:

| Docket No. | Year | Deficiency |
|------------|------|------------|
| 19315-96 | 1992 | $71,828 |
|          | 1993 | 89,717 |

| | 19321-96 | 1992 | 58,332 |
| | | 1993 | 202,886 |

After concessions, the only issue for decision in this case is the fair market value of (1) real property consisting of 11.656 acres of land with a building upon it and 30.3 acres of adjoining land on December 17, 1992, and (2) real property consisting of 50,507 square feet of land with a building upon it on September 23, 1992, for purposes of determining the proper amount of petitioners' charitable contribution deductions.[1]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and the attached exhibits are incorporated herein by this reference. Petitioners John T. Talkington and Margaret K. Talkington, husband and wife, and petitioners Henry A. Sessions and Barbara Sessions, husband and wife, resided in Lubbock, Texas, at the time they filed their petitions. Mr. and Mrs. Talkington and Mr. and Mrs. Sessions filed Federal income tax returns for 1992 and 1993.

The Litton Property

The Litton property consists of: (1) A 48,215-square foot building (the Litton building) located on 11.656 acres of platted land rectangular in shape at the intersection of Loop 289, which

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

is to the south of the lot, and Martin Luther King Boulevard (MLK),[2] which is to the west of the lot (the 11.656 acres); (2) 30.3 acres of vacant, unplatted land irregular in shape that adjoins the 11.656 acres on the east and north of the 11.656 acres (the parcel of 30.3 acres);[3] and (3) 8.56 acres of vacant, unplatted land rectangular in shape fronting on MLK and adjoining the 11.656 acres on the north of the 11.656 acres and adjoining the parcel of 30.3 acres on the west of the parcel of 30.3 acres (the 8.56 acres).  The Litton property was located in the northeast part of Lubbock and was zoned M-1 for light manufacturing.  The predominant use of the land around the Litton property is currently agricultural.

In 1964, Litton Industries, Inc. (Litton), constructed the Litton building, and Litton occupied it until 1983 when Litton ceased operations.  In 1983, after Litton ceased operations, it offered the Litton property for sale.  From 1983 through 1985, Litton asked $1,200,000 for the Litton property.  In 1985, Litton reduced the price to $900,000.  In April of 1986, Litton again reduced the price to $600,000.

---

[2]  MLK was formerly North Quirt Avenue.

[3]  Access to the parcel of 30.3 acres was available through two places:  (1) Approximately 400 feet of frontage on Loop 289 on the south side of the parcel of 30.3 acres, and (2) approximately 615 feet of frontage on Ursuline Street on the north side of the parcel of 30.3 acres.  Ursuline Street was a one-lane gravel road.  The 8.56 acres, see infra, essentially restricts access from MLK to the parcel of 30.3 acres.

In July of 1986, Mr. Talkington and Mr. Sessions purchased the Litton property from Litton for $600,000. Mr. Talkington and Mr. Sessions each owned a 50-percent undivided interest in the Litton property.

During the 6 years that Mr. Talkington and Mr. Sessions owned the Litton property, it was never occupied or leased. Also during this time, the Litton building suffered from normal wear and tear, deferred maintenance, and vandalism. The deferred maintenance on the Litton building included the following: (1) The parking lot asphalt was cracked, and the face was coming off in places (the cracks needed sealing and the lot possibly needed to be resurfaced); (2) the concrete flatwork on the sidewalks, drives, and walks was cracked, and the face was coming off; (3) there was a broken window in the north entrance; (4) the landscaping had been neglected, and some shrubs and trees were dead; (5) the floor tiles were damaged due to flooding in the past; (6) many ceiling tiles were missing, stained, and/or in poor repair; and (7) the walls were dirty and/or stained from draining of the building's sprinkler system. Additionally, the copper hot and chilled water piping had been stolen from the Litton building.

The Lubbock Central Appraisal District (LCAD) determined the appraised value of the Litton property to be $570,912 as of July 14, 1989. Petitioners appealed this assessed value and hired

James Stanley Blacklock to protest the valuations placed on the Litton property by the LCAD. Mr. Blacklock, in a document presented to the LCAD on petitioners' behalf, represented that all copper plumbing had been stolen from the Litton building, and for all practical purposes the building was a shell. Mr. Blacklock indicated that the best possible use for the Litton building was as a warehouse which would require stripping the inside. In 1989, Mr. Blacklock estimated the value of the Litton property to be $336,000.

The LCAD determined the appraised value of the Litton property to be $499,338 as of July 19, 1990. The LCAD determined the appraised value of the Litton property to be $499,338 for the years 1991 and 1992.

On December 17, 1992, petitioners gave the 11.656 acres, the parcel of 30.3 acres, and the Litton building (the gifted Litton property) to the South Plains Food Bank, Inc. Petitioners retained the 8.56 acres. The South Plains Food Bank, Inc., is a qualified charitable organization under section 170.

Based on an appraisal that determined the fair market value of the gifted Litton property to be $1,805,000[4] on December 15, 1992, Mr. and Mrs. Talkington and Mr. and Mrs. Sessions deducted $900,000 and $902,500, respectively, as charitable contributions

---

[4] We note that both petitioners' and respondent's appraisers occasionally rounded their estimates of fair market value to the nearest hundred or thousand dollars.

on their 1992 Federal income tax returns for the gift of the gifted Litton property.[5]

Respondent determined that the fair market value of the gifted Litton property on December 17, 1992, was $800,000.

The Bates Center

The Bates Center consists of a 10,022 square foot building (the Bates Center building) located on 50,507 square feet of land (the Bates Center land) on the 1700 block of 46th Street in Lubbock, Texas. The Bates Center land was zoned R-2 residential with a church variance.

The Bates Center land consists of six lots. Five of the lots were contiguous (the 5 lots). Three of the five lots were located on 45th Street. The westernmost lot was approximately 60 feet from Avenue S, and the easternmost lot was approximately 300 feet from Avenue Q. Two of the five lots were located on 46th Street. The westernmost lot was approximately 120 feet from Avenue S, and the easternmost lot was approximately 300 feet from Avenue Q. The other lot (the excess lot) was noncontiguous with the five lots and was located across the street from the five lots on the northeast corner of the intersection of Avenue S and 45th Street.

_____

[5] None of the parties explained why Mr. and Mrs. Talkington deducted $900,000 rather than $902,500 on their 1992 Federal income tax return.

The Bates Center building was primarily a gymnasium with a full length basketball court, but it also contained some small classrooms, a storage area, a parlor, a small kitchen, locker rooms, rest rooms, and a small fireplace. The Bates Center could be used as a church.

On June 7, 1991, Mr. Sessions acquired the Bates Center and the adjoining church (located directly to the east of the Bates Center) in a trade with the First Church of the Nazarene. The traded properties were each valued at $600,000. Mr. Sessions owned the entire fee simple interest in the Bates Center.

On September 23, 1992, Mr. Sessions gave the Bates Center to the Northwest Texas Church of God in Christ. The Northwest Texas Church of God in Christ purchased the church that adjoins the Bates Center for $550,000.[6] The Northwest Texas Church of God in Christ is a qualified charitable organization under section 170.

Based on an appraisal that determined the fair market value of the Bates Center to be $350,000 on December 23, 1992, Mr. and Mrs. Sessions deducted $350,000 as a charitable contribution on their 1992 Federal income tax return for the gift of the Bates Center.

Respondent determined that the market value of the Bates Center on September 23, 1992, was $178,000.

_____

[6] Although it is unclear from the record, it appears that the gift of the Bates Center and the purchase of the adjoining church occurred relatively close in time to one another.

ULTIMATE FINDINGS OF FACT

The fair market value of the gifted Litton property on December 17, 1992, was $986,589. The fair market value of the Bates Center on September 23, 1992, was $237,154.

OPINION

The issue for decision is the fair market value of the transferred properties for purposes of determining the proper amount of petitioners' charitable contribution deductions. Petitioners bear the burden of proving that the fair market value of the transferred properties exceeds the value determined by respondent in the notices of deficiency. Rule 142(a).

Section 170 allows an individual to deduct charitable contributions, subject to certain percentage limitations, with a carryover of any excess contributions.[7] See sec. 170(b), (d). If a charitable contribution is made in property other than money, the amount of the taxpayer's contribution is the fair market value of the property at the time of the contribution. Sec. 1.170A-1(c), Income Tax Regs. Section 1.170A-1(c)(2), Income Tax Regs., defines fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."

---

[7] The parties have stipulated that the transfers of the gifted Litton property and the Bates Center qualify for charitable contribution deductions pursuant to sec. 170(c).

The fair market value of donated property as of a given date is a question of fact to be determined from the entire record. Symington v. Commissioner, 87 T.C. 892, 896 (1986); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984).  Fair market value reflects the highest and best use of the property on the date of valuation.  Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986).  The highest and best use of property is the realistic, objective potential use to which the property can be put.  Id.; see also Olson v. United States, 292 U.S. 246, 255-256 (1934).  The determination of fair market value is not dependent upon whether the property is actually being put to its highest and best use.  Symington v. Commissioner, supra at 897.  Thus, in determining the reasonable and probable use that supports the highest present value, we focus on the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future".  Olson v. United States, supra at 255.

In this case, the parties have relied extensively on the testimony of expert witnesses to support their respective views on the fair market value.  Before turning to an analysis of the divergent expert opinions, we note that, as the trier of fact, the Court must weigh the evidence presented by the experts in light of their demonstrated qualifications in addition to all other credible evidence.  Estate of Christ v. Commissioner, 480

F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970).  We are
not bound by the opinion of any expert witness, especially when
that opinion is contrary to our judgment.  Estate of Kreis v.
Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo.
1954-139; Chiu v. Commissioner, 84 T.C. 722, 734 (1985).  Rather,
we may accept or reject expert testimony as we find appropriate
in our best judgment.  Helvering v. National Grocery Co., 304
U.S. 282, 294-295 (1938); Seagate Tech., Inc., & Consol. Subs. v.
Commissioner, 102 T.C. 149, 186 (1994).  Moreover, even if we
accept the general methodology of an expert witness, we may
reject that expert's ultimate conclusion if it is unsupported by
the record.  Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d
1315, 1331 (5th Cir. 1987), affg. T.C. Memo. 1985-267.

Furthermore, we are dismayed at the time and energy both the
parties and the Court have had to expend in the course of the
trial and decision in this case.  As we have repeatedly stated in
regard to valuation cases:

> Too often in valuation disputes the parties have
> convinced themselves of the unalterable correctness of
> their positions and have consequently failed
> successfully to conclude settlement negotiations--a
> process clearly more conducive to the proper
> disposition of disputes such as this.  The result is an
> overzealous effort, during the course of the ensuing
> litigation, to infuse a talismanic precision into an
> issue which should frankly be recognized as inherently
> imprecise and capable of resolution only by a Solomon-
> like pronouncement.  * * * [Messing v. Commissioner, 48
> T.C. 502, 512 (1967).]

See also Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 451-452 (1980).  We are now faced with the task of rationally resolving differences in the opinions and often subjective analyses of two qualified experts.  In reaching our ultimate conclusions as to the valuation of the parcels here in issue, we must, because of the possibility of an appeal, set out a trail for the appellate court to follow.  See Symington v. Commissioner, supra at 904.  We are constrained to admit, however, that by necessity our conclusions are to some extent based upon Solomon-like pronouncements.  We remain convinced, as we have repeatedly stated, that valuation cases should be disposed of by the parties by way of settlement or other procedures short of court proceedings.  See, e.g., Symington v. Commissioner, supra at 904-905.

## I.   The Experts

Petitioners' expert was Tommy Cantrell, MAI, RM.  Mr. Cantrell has been an appraiser of property for approximately 28 years.  On December 31, 1992, on behalf of petitioners, Mr. Cantrell appraised the gifted Litton property.  On January 7, 1993, on behalf of Mr. Sessions, Mr. Cantrell appraised the Bates Center.

Respondent's expert was Dr. Jack Friedman, Ph.D., MAI, CRE, ASA, C.P.A., and a Texas State Certified General Appraiser.  In

1997, on behalf of respondent, Dr. Jack Friedman appraised the gifted Litton property and the Bates Center.

## II. Highest and Best Use

The parties differ over the highest and best use of the various properties in issue in this case. We note that our determination of the highest and best use of the various properties in issue presents a problem of judgment, not mathematics. Stanley Works & Subs. v. Commissioner, 87 T.C. at 408.

### A. The Litton Building

Dr. Friedman's report determined that the highest and best use of the Litton building at the time of the gift was as an industrial facility. Dr. Friedman based his determination on the fact that the Litton building was an existing industrial building, and this use was consistent with legal and possible uses. Additionally, the building was functionally adequate for this purpose. Furthermore, Dr. Friedman noted that the oversupply of such buildings in Lubbock drastically curtailed new construction of such buildings. He felt that the Litton building had the potential for generating market rent upon further tightening of the local real estate market.

Mr. Cantrell determined that the highest and best use of the Litton building at the time of the gift was as a specialty manufacturing facility (also known as a research and development

facility).  Mr. Cantrell testified that the Litton building was originally built as a special manufacturing facility by Litton-- it was used to assemble electronics.  In addition, Mr. Cantrell based his determination on the fact that the Litton building was fully heated and air-conditioned and had suspended ceilings, heavy-duty fluorescent lights, a Muzak system, and sprinklers.

Additionally, Mr. Cantrell testified that, during the period in which Mr. Talkington and Mr. Sessions owned the Litton property, the U.S. Army Corps of Engineers considered buying or leasing the Litton building for use as a "hospital-type environment".  In his report, however, Mr. Cantrell wrote that the expense to convert the Litton building to the use that the U.S. Army Corps of Engineers desired was considerable and, in all likelihood, was the reason this use never came to pass.

Mr. Cantrell's report also states that research and development style industrial buildings were relatively scarce in the Lubbock market, demand for research and development buildings was somewhat weak, once vacant these properties stay vacant for several years, research and development buildings tend to be built to the owner/occupant's specifications, and conversion to other uses for other occupants could be an expensive process. Furthermore, Mr. Cantrell's report states that some other possible uses of the Litton building were warehouse use and

warehouse/office use; however, these uses would probably produce less income than research and development use would.

We also note that the Litton building's bathrooms were designed to accommodate 400 people per shift, and it had a cafeteria and a significant number of offices.

Based upon our review of all the evidence, giving due consideration to our observation at trial of the witnesses for both parties and considering their testimony and the expert reports, we conclude that the highest and best use of the Litton building on the date of valuation was as an industrial facility such as a warehouse or warehouse/office.

B.    The Parcel of 30.3 Acres

1.    Mr. Cantrell's Report and Petitioners' Contentions

Mr. Cantrell determined that the highest and best use of the parcel of 30.3 acres at the time of the gift was as an industrial subdivision (11 industrial lots).  In reaching this conclusion, Mr. Cantrell states in his report that the lots had good and typical access, the site was zoned M-1 for light industrial use, and the location of the parcel of 30.3 acres would almost certainly dictate commercial or industrial uses while excluding agricultural and residential uses.

Petitioners also contend that the parcel of 30.3 acres was part of the "Lubbock Industrial Park".  Henry Huneke, an employee of Mr. Sessions who has worked in the construction business in

Lubbock since 1944, testified that the Lubbock Industrial Park lies north and east of MLK and Loop 289.  He stated that the Lubbock Industrial Park was created by the Board of City Development and the Lubbock Chamber of Commerce back in the early 1950's.  Mr. Huneke testified on direct examination that the Lubbock Industrial Park was a platted, ready-to-use industrial park with utilities and that the Lubbock Industrial Park had its own zoning classification.  Mr. Huneke further testified that the Litton property was in the Lubbock Industrial Park.  On cross-examination, Mr. Huneke changed his testimony and stated that the Lubbock Industrial Park was "preliminary platted" so that a user might immediately file a plat and move quickly through the platting process.

Mr. Cantrell also testified about the Lubbock Industrial Park.  Mr. Cantrell testified that the Lubbock Industrial Park contained platted lots, and it was developed by the City of Lubbock to promote industrial development in the area in which it was located.  Mr. Cantrell further testified that the Litton property was in the Lubbock Industrial Park.  Mr. Cantrell's report does not specifically mention the Lubbock Industrial Park; however, petitioners suggest that the maps included in Mr. Cantrell's report, which do not show the boundaries of the Lubbock Industrial Park but do make reference to the Lubbock

Industrial Park, are evidence that the Lubbock Industrial Park exists.

Mr. Cantrell, in a report prepared in 1988 for the U.S. Army Corps of Engineers, described the parcel of 30.3 acres and 8.56 acres as "VACANT AGRICULTURE" and did not mention the Lubbock Industrial Park.

2. Dr. Friedman's Report and Respondent's Contentions

Dr. Friedman determined that the highest and best use of the parcel of 30.3 acres at the time of the gift was agricultural. In reaching this conclusion, Dr. Friedman's report states that the parcel of 30.3 acres was located in an area primarily devoted to agriculture. Dr. Friedman noted that the parcel of 30.3 acres had approximately 400 feet of frontage on the (one-way) access road of Loop 289, nearly 620 feet on Ursuline Street (a one-lane gravel road), and no frontage on MLK. He felt that this modest amount of frontage, relative to the parcel of 30.3 acres size, relegated the tract to agricultural uses and that the parcel of 30.3 acres proximity to the Litton building renders the parcel of 30.3 acres less desirable for industrial uses than it otherwise would be. In further support of his analysis, Dr. Friedman pointed out that the industrial submarket had been weak over the few years preceding 1992 and that industrial development was unlikely in the neighborhood because market rental rates did not justify new construction on an investment basis.

Respondent argues that, despite the fact that the parcel of 30.3 acres was zoned M-1, there was not a reasonable probability in 1992 that it would be used as an industrial park in the reasonably near future. Furthermore, respondent contends that petitioners' retention of the 8.56 acres effectively eliminated the possibility of the parcel of 30.3 acres' becoming an industrial park because of the lack of reasonable access to a main commercial thoroughfare.

### 3. Additional Information

The Litton property was located in the northeast part of Lubbock. Respondent contends that, during the last 20 years, most of the real estate development has taken place in the southeast and southwest parts of Lubbock. Mr. Cantrell indicated in his report that the bulk of industrial development had been in southeast Lubbock.

Mr. Cantrell's report further stated that Lubbock had virtually no growth since 1984 and that general business activity was still somewhat depressed in Lubbock, but had improved over the recent past. Additionally, Mr. Cantrell's report states that there was a relatively slow market for land in the neighborhood in which the Litton property was located.

### 4. Conclusion

We have reviewed the maps submitted with the expert reports. The maps clearly identify two properties as lots that were part

of the Lubbock Industrial Park.  One lot was labeled "Lubbock Industrial Park Add. Lot 1" and was located directly south of the 11.656 acres on the opposite side of the intersection of Loop 289 and MLK.  The other lot was labeled "Lubbock Indus. Park Add. Lot 5" and was located to the east of the Litton property.  Neither the 11.656 acres nor the parcel of 30.3 acres was labeled as part of the Lubbock Industrial Park on the maps submitted by the experts.

While we do agree with petitioners that the Lubbock Industrial Park indeed existed, on the basis of the evidence presented we do not believe that the parcel of 30.3 acres was a part of the Lubbock Industrial Park.  The parcel of 30.3 acres was unplatted, and we believe from the evidence and testimony that the lots in the Lubbock Industrial Park were platted.  Mr. Cantrell's report fails to mention that the parcel of 30.3 acres was part of the Lubbock Industrial Park.  Furthermore, the parcel of 30.3 acres was not zoned with the special industrial park classification about which Mr. Huneke testified.

Although the parcel of 30.3 acres was zoned M-1 for light industrial use, we do not believe that there existed a reasonable probability that the parcel of 30.3 acres would be used for industrial purposes in the reasonably near future at the time of its donation.  See Olson v. United States, 292 U.S. at 255.  The evidence suggests that access to the parcel of 30.3 acres was

fairly restricted, that the bulk of industrial development had been taking place in south Lubbock rather than in the northeast section of Lubbock where the parcel of 30.3 acres was located, and that the market for land around the Litton property was slow. Furthermore, the parcel of 30.3 acres was unplatted, and platting property to the City of Lubbock cost approximately 45-to-50 cents per square foot.

Based upon our review of all the evidence, giving due consideration to our observation at trial of the witnesses for both parties and considering their testimony and the expert reports, we conclude that the highest and best use of the parcel of 30.3 acres on the date of valuation was as agricultural land.

C.    The Bates Center

Mr. Cantrell determined that the highest and best use of the Bates Center at the time of the gift was for use in conjunction with the adjoining church property.  In reaching this conclusion, Mr. Cantrell states in his report that by virtue of its size, the Bates Center building could not accommodate much more in the way of improvements.  He further states that the adjoining church needs the Bates Center building and its parking lot to make a more functional package.  Mr. Cantrell reached his ultimate conclusion based on the fact that he felt that the Bates Center was limited to church and church-related uses.  Furthermore, Mr.

Cantrell states in his report that the land was too far off Avenue Q to be feasible for commercial uses.

Dr. Friedman determined that the highest and best use of the Bates Center at the time of the gift was as follows: (1) Continued use of the five lots as an activity building, and (2) use of the excess lot for residential purposes. In reaching this conclusion, Dr. Friedman noted that the Bates Center was in a neighborhood of single-family homes, it was one-half block west of Avenue Q (a heavily traveled commercial street), and it lacks a driveway or visibility from Avenue Q. Dr. Friedman also pointed out that the Bates Center was zoned R-2, which allowed duplexes as well as single-family residences and that a church was a legal nonconforming use. Although commercial uses were allowed by zoning within 85 feet of Avenue Q, Dr. Friedman pointed out that the Bates Center was located more than 300 feet from Avenue Q. Dr. Friedman suggested that for the five lots a church-related facility would likely provide a higher residual value than residential use and for the excess lot a single-family or duplex home would be appropriate.

Petitioners devote much of their argument to the proposition that the Bates Center could be rezoned for commercial use. Mr. Sessions' expert, however, determined in his report that the highest and best use of the Bates Center was for continued use by the adjoining church and that commercial use of the property was

not feasible. Neither expert considered the highest or best use of the Bates Center to be a commercial property, and the record does not support such a determination.

Bishop William H. Watson testified that some churches in Lubbock started in a gymnasium without a sanctuary. Bishop Watson testified, "I had made up my mind if I had to take just the gym only, I would stay in the gym as the church because I see some other churches do that kind of thing." We find that the use of the Bates Center as a stand-alone church is supported by the record.

Based upon our review of all the evidence, giving due consideration to our observation at trial of the witnesses for both parties and considering their testimony and the expert reports, we conclude that the highest and best use of the Bates Center on the date of valuation was as a church.

III. Valuation Methodology

The parties presented the following methods of valuing the various properties in issue in this case: (1) The sales comparison method, (2) the cost approach, and (3) the income approach.

The sales comparison method involves gathering information on sales of property similar to the subject property, then making

adjustments[8] for various differences between the "comparables" and the property being appraised.  Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24 (1987).  This Court has found the sales comparison method to be a reasonable one and has used it in the past.  See, e.g., Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979).  Additionally, we have found that it is generally the most reliable method of valuation. Estate of Spruill v. Commissioner, supra at 1229 n.24.

The cost approach is based on the principle of substitution. The cost approach derives the value of a property by estimating the reproduction or replacement cost of the improvements, deducting therefrom the estimated depreciation, and then adding the market value of the land.  This approach estimates value based on the assumption that a prudent person will not pay more for a property than it would cost to acquire a site and erect a comparable structure (less accrued depreciation).  This approach is especially applicable to new or nearly new structures when the land value is also reliable.  The major limitation of this approach is that in properties that are several years old it is often difficult to precisely estimate the accrued depreciation

---

[8]  Positive adjustments are made to comparable properties that are inferior in some fashion to the subject property; negative adjustments are made to comparable properties that are superior in some fashion to the subject property.

and the problem is compounded if depreciation exists in more than one form (e.g., physical, functional, and economic obsolescence).

The income approach estimates value based upon future benefits (cash-flow) to be derived from the ownership of a property.  This approach is most applicable to income-producing-type properties as it involves estimating gross income and then deducting estimated vacancy, losses, and expenses to compute net income.  This net income is processed into an indication of value by using several different methods and techniques to determine the proper capitalization and/or discount rate.

In their reports, both experts used all three methods to value the Litton building.  In their reports, both experts used the sales comparison method to value the 11.656 acres.  In his report, Mr. Cantrell used a "development approach", which is equivalent to the income approach, to value the parcel of 30.3 acres.  In his report, Dr. Friedman used the sales comparison method to value the parcel of 30.3 acres.  In their reports, both experts used the sales comparison method and the cost approach to value the Bates Center.  Both experts agree that the income approach was not applicable to determining the value of the Bates Center.

The sales comparison method was the methodology most important to both experts in valuing the gifted Litton property. The sales comparison method was the methodology most important to

Dr. Friedman in valuing the Bates Center. The cost approach was the methodology most important to Mr. Cantrell in valuing the Bates Center.

As Mr. Cantrell states in his report, buildings like the Litton building are built for owner occupants and tend to be owner occupied and not to be rented in the market. Additionally, Mr. Cantrell's report states that the sales comparison method is generally recognized as being the best method for valuing land as if vacant and ready for improvement to its highest and best use.

Based on our review of the record and the weight accorded the sales comparison method by both parties, we deem it appropriate to set aside the cost and income approach to valuation in this case. Instead, we rely on the sales comparison method in determining the value of the gifted Litton property and the Bates Center.

## IV. Fair Market Value of the Gifted Litton Property

Mr. Cantrell determined the fair market value of the gifted Litton property on December 15, 1992, to be $1,805,000. Dr. Friedman determined the fair market value of the gifted Litton property on December 17, 1992, to be $800,000 (before subtracting costs required to place the building into service).

### A. The 11.656 Acres

Under the sales comparison method, Mr. Cantrell determined the fair market value of the 11.656 acres (which was 507,728

square feet) on December 15, 1992,[9] to be $380,000 based on a value of $0.75 per square foot.  Mr. Cantrell compared the 11.656 acres to eight other land comparables that ranged in size from 25,264 square feet to 1,408,948 square feet, that were sold or were being offered for sale between January of 1986 and December of 1992, and that had sale prices or offers between $0.12 and $1.10 per square foot.  After adjusting his comparables, he determined that the comparable properties had a mean price per square foot of $0.57.

Mr. Cantrell did not adjust the comparables for changes in market conditions (time).  Mr. Cantrell's report states that there was a relatively slow market for land in the neighborhood in which the Litton property was located.  According to Mr. Cantrell, this supported his decision not to adjust the comparables for changes in market conditions.  Mr. Cantrell adjusted the comparables for location, size, and "other".[10] Almost all of Mr. Cantrell's adjustments were positive, although he did make negative adjustments to three comparables for size and to one for "other".

We believe Mr. Cantrell's conclusions to be unrealistic and unreliable.  In his analysis, virtually every property was inferior except the highest price sale ($1.10 per square foot)--a property that was considerably smaller in size and located in a

---

[9]  Petitioners donated the gifted Litton property on Dec. 17, 1992, not on Dec. 15, 1992.

[10]  It is unclear what "other" adjustment was for.

different part of Lubbock--and a comparable that was being offered for sale at $1.00 per square foot. Additionally, Mr. Cantrell chose to use offers for sale and uncompleted sales in his analysis. Furthermore, Mr. Cantrell's reason for applying positive adjustments totaling 50 percent to a property that was similar in size to the 11.656 acres, that had a better location than the 11.656 acres, and that sold for $0.25 per square foot was "perhaps the purchasers just got a good deal when they bought this land." We conclude that Mr. Cantrell's adjustments are unwarranted.

Under the sales comparison method, Dr. Friedman determined the fair market value of the 11.656 acres on December 17, 1992, to be $97,000 based on a value of $0.19 per square foot. Dr. Friedman compared the 11.656 acres to four other land comparables that ranged in size from 217,800 square feet to more than 1,409,000 square feet, that were sold between August of 1985 and April of 1993, and that had sale prices between $0.23 and $0.75 per square foot. Three of the four comparables Dr. Friedman used were also used by Mr. Cantrell.

We find that Dr. Friedman's report provides a better indication of the fair market value of the 11.656 acres. Dr. Friedman reasonably discounted all of his comparables due to their more desirable location--two were located closer to the airport and the two were located on more desirable parts of Loop 289. Dr. Friedman's adjustment for time, however, was

unreasonable, and we shall not apply an adjustment for time. There was a slow market for land in the neighborhood in which the Litton property was located, and since 1984 Lubbock had virtually no growth.

After removing Dr. Friedman's time adjustment, the adjusted sale prices of the four comparables he used are $0.24, $0.25, $0.25 and $0.38 per square foot.

Based upon our review of all the valuation evidence, giving due consideration to our observation at trial of the witnesses for both parties and considering their testimony and the expert reports, we conclude that the 11.656 acres was worth $0.28 per square foot for a total value of $142,164.

B.    The Litton Building

Under the sales comparison method, Mr. Cantrell determined the fair market value of the Litton building (which was 48,215 square feet) on December 15, 1992, to be $819,655 based on a value of $17 per square foot.  Under the sales comparison method, Dr. Friedman determined the fair market value of the Litton building on December 17, 1992, to be $723,225 based on a value of $15 per square foot.

Mr. Cantrell compared the Litton building to five other comparables which were as follows:

| Building | Sale Date | Bldg. Size (Sq. Ft.) | Price Per Sq. Ft. For Bldg. |
|----------|-----------|----------------------|------------------------------|
| LB1 | 12/88 | 72,500 | $12.69 |
| LB2 | 3/90 | 24,140 | 28.47 |
| LB3 | 1/89 | 26,505 | 41.58 |
| LB4 | 9/92 | 10,850 | 6.08 |
| LB5 | 12/92 | 34,560 | 12.17 |

Dr. Friedman compared the Litton building to four of these same five comparables. Mr. Cantrell adjusted the comparables for time, location, size, quality, condition, and "other". Dr. Friedman adjusted the comparables for location, quality, condition, and "other".

Dr. Friedman did not adjust the comparables for time, but Mr. Cantrell applied a negative time adjustment of 5 percent to LB1 and LB3. These two properties were sold in December of 1988 and January of 1989. We conclude that these adjustments are reasonable due to the slow market in Lubbock and the fact that since 1984 Lubbock had virtually no growth.

LB1 was located near the Litton building, but LB2, LB3, LB4, and LB5 were located in southern Lubbock. As both parties pointed out, southern Lubbock was where the bulk of industrial development had taken place; therefore, comparable properties located in southern Lubbock were in a more desirable location than the Litton building. Mr. Cantrell's report, however, only made a negative location adjustment to LB3 (negative 10 percent). Instead, he made positive location adjustments to LB2 and LB5 and none to LB4. Dr. Friedman, however, applied negative location adjustments to LB2 (negative 10 percent), LB3 (negative 20 percent), and LB5 (negative 5 percent).

We are more persuaded by Dr. Friedman's location adjustments than by Mr. Cantrell's. We shall not adjust LB1 for location and shall apply a negative adjustment of 10 percent to the other four

comparables for location in order to determine the value of the Litton building.

The conclusory statements in Mr. Cantrell's report that the Litton building was of a superior construction to LB1, LB2, LB4, and LB5 do not explain how the Litton building was superior. Mr. Cantrell made positive adjustments to LB1, LB2, LB4, and LB5 of 30 percent, 10 percent, 30 percent, and 20 percent, respectively, for the Litton building's superior construction. He made no adjustment, however, to LB3 even though he noted it was newer than the Litton building.

Dr. Friedman, however, explained that LB1 was inferior because it was a metal exterior building, and therefore he made a 10-percent positive adjustment to LB1. Dr. Friedman also noted that LB3 was a superior quality building due to its age and modern quality construction standards. Therefore, he applied a 20-percent negative adjustment.

We are unconvinced by Mr. Cantrell's unexplained quality adjustments and shall not apply his adjustments for quality in order to determine the value of the Litton building. We are persuaded by Dr. Friedman's quality adjustments and shall use them in order to determine the value of the Litton building.

Mr. Cantrell also adjusted the comparables for size. He applied a positive adjustment of 10 percent to the one comparable (LB1) that was larger than the Litton building and applied negative adjustments of 10 percent, 10 percent, and 15 percent to

the comparables LB2, LB3, and LB4, respectively, which were smaller than the Litton building.  We are convinced that these adjustments are reasonable and shall use them in order to determine the value of the Litton building.

Mr. Cantrell also adjusted the comparables for condition (age).  He applied negative adjustments of 10 percent, 25 percent, 5 percent, and 10 percent to the LB2, LB3, LB4, and LB5, respectively.  Dr. Friedman also applied a negative adjustment of 20 percent to LB4 due to its age.  We are convinced by Mr. Cantrell's condition adjustments and shall use them in order to determine the value of the Litton building.

Mr. Cantrell adjusted the comparables under "other" as follows:  (1) LB1 positive 10 percent for inferior features, (2) LB3 negative 10 percent for lease influence, and (3) LB4 positive 10 percent for motivation of the seller.  Dr. Friedman also adjusted LB5 positively 10 percent under "other" for motivation of the seller.

Based on the record, we fail to understand why Mr. Cantrell adjusted LB1 for inferior features under "other".  He already applied a positive 30-percent adjustment under quality noting that LB1 was inferior.  We are unconvinced by Mr. Cantrell's unexplained additional quality adjustment to LB1 under "other" and shall not apply this adjustment to LB1 in order to determine the value of the Litton building.

We are convinced that the lease adjustment and adjustments for motivated sellers are well founded and shall apply a positive adjustment to LB3 of 10 percent and shall apply a positive adjustment to LB4 and LB5 of 10 percent.

After applying the adjustments we find proper to the comparables, the adjusted price per square foot for the five comparables is as follows:

| | LB1 | LB2 | LB3 | LB4 | LB5 |
|---|---|---|---|---|---|
| Price Per Square Foot | $12.69 | $28.47 | $41.58 | $6.08 | $12.17 |
| Adjustments | | | | | |
| - Location | 0% | (10%) | (10%) | (10%) | (10%) |
| - Quality | 10% | 0% | (20%) | 0% | 0% |
| - Size | 10% | (10%) | (10%) | (15%) | 0% |
| - Condition | 0% | (10%) | (25%) | (5%) | (10%) |
| - Other | 0% | 0% | 10% | 10% | 10% |
| - Time | (5%) | 0% | (5%) | 0% | 0% |
| Total Adjustment | 15% | (30%) | (60%) | (20%) | (10%) |
| Adjusted Price Per Square Foot | $14.59 | $19.93 | $16.63 | $4.86 | $10.95 |

Based upon our review of all the valuation evidence, giving due consideration to our observation at trial of the witnesses for both parties and considering their testimony and the expert reports, we conclude that the Litton building was worth $15 per square foot for a total value of $723,225.

C.   The Parcel of 30.3 Acres

Mr. Cantrell used the development approach to appraise the parcel of 30.3 acres. He determined the fair market value of the parcel of 30.3 acres as of December 15, 1992, to be $605,000. According to Mr. Cantrell, the development approach, which discounts the income stream from lot sales over a period of time, is the equivalent of an income approach. As we have previously

stated, we do not believe that the income approach was an appropriate way to value the property at issue in this case.

In his report, Mr. Cantrell set forth various problems inherent in the development approach including that (1) the large number of variables involved that makes this method susceptible to error; (2) it is impossible to accurately predict when lots will sell, and the best anyone can do is to make a "reasonable" guess; (3) the expenses incurred in developing the property are unknown and must be estimated; and (4) the discount factor applied to the estimated cash-flows must be estimated and is subject to disagreement. Additionally, Mr. Cantrell's report states that the sales comparison method is generally recognized as being the best method for valuing land as if vacant and ready for improvement to its highest and best use. Furthermore, as we have found that the highest and best use of the parcel of 30.3 acres was as agricultural land, and because Mr. Cantrell's development analysis was based upon developing the parcel of 30.3 acres into an industrial subdivision, Mr. Cantrell's report is not helpful to our determination of the value of the parcel of 30.3 acres.

Under the sales comparison method, Dr. Friedman determined the fair market value of the parcel of 30.3 acres on December 17, 1992, to be $91,000 based on a value of $3,000 per acre. Dr. Friedman compared the parcel of 30.3 acres to six other comparables which were as follows:

| Land | Sale Date | Size (Acres) | Price Per Acre |
|------|-----------|--------------|----------------|
| TA1 | 8/85 | 290.0 | $2,000 |
| TA2 | 12/92 | 20.4 | 5,144 |
| TA3 | 4/91 | 62.0 | 3,387 |
| TA4 | 4/97 | 31.0 | 2,063 |
| TA5 | N/A | 68.4 | 2,000 |
| TA6 | N/A | 172.5 | 381 |

TA1, TA2, and TA3 were completed sales; TA4 was a listing on a property that had been held for sale for 5 years; TA5 and TA6 were tax comparables and were not for sale, and the price per acre was based on the assessed value of the land. Dr. Friedman adjusted the comparables for time, location, size, and the nature of the site.

We note that Dr. Friedman, in reaching his conclusion about fair market value, relied on the three sales (TA1, TA2, and TA3) and the property listed for sale (TA4). He did not rely on the tax comparables (TA5 and TA6). On this basis, we also shall not rely on the tax comparables in reaching our conclusion as to the fair market value of the parcel of 30.3 acres.

Dr. Friedman's negative adjustment for time was unreasonable. There was a slow market for land in the neighborhood in which the Litton property was located, and since 1984 Lubbock had virtually no growth. We shall not adjust any of the comparables for time in order to determine the value of the parcel of 30.3 acres.

TA1 was located closer to the airport than the parcel of 30.3 acres, and TA1 had extensive frontage along MLK. Dr. Friedman did not adjust TA1 for location because he felt that the parcel of 30.3 acres' frontage on Loop 289 offset TA1's proximity

to the airport. TA2 was located closer to Lubbock's central business district than the parcel of 30.3 acres, and therefore Dr. Friedman applied a negative location adjustment of 50 percent to TA2. TA3 was located on the access road to Loop 289 and was much closer to Interstate 27 than the parcel of 30.3 acres. Dr. Friedman, therefore, applied a negative location adjustment of 10 percent to TA3. TA4, located one-half mile from the parcel of 30.3 acres, had access to MLK but no frontage on Loop 289. Based on these facts, Dr. Friedman applied a positive location adjustment of 30 percent to TA4. We are convinced that the adjustments Dr. Friedman made for location are appropriate, except we believe that the adjustment to TA2 was excessive. We believe that a negative adjustment to TA2 of 20 percent is more appropriate. We shall use these location adjustments in order to determine the value of the parcel of 30.3 acres.

Dr. Friedman also adjusted the comparables for size. He applied a positive adjustment of 10 percent to TA3 because it was approximately twice the size of the parcel of 30.3 acres and a positive adjustment of 30 percent to TA1 because it was much larger than the parcel of 30.3 acres. We are convinced that these adjustments are reasonable and accept them in order to determine the value of the parcel of 30.3 acres.

Dr. Friedman also made a "site" adjustment to TA2 because TA2 was a pit. He applied a positive adjustment of 20 percent. We are convinced that an upward adjustment is appropriate because

of the nature of the site; however, we shall apply a positive adjustment of 40 percent.

Petitioners contend that TA3 was a highly motivated sale. There was credible testimony that this sale was motivated. We therefore shall apply a positive adjustment of 20 percent to TA3 for motivation of the sellers in order to determine the value of the parcel of 30.3 acres.

After applying the adjustments we find proper to the comparables, the adjusted price per acre for the four comparables is as follows:

|  | TA1 | TA2 | TA3 | TA4 |
|---|---|---|---|---|
| Price Per Acre | $2,000 | $5,144 | $3,387 | $2,063 |
| Adjustments |  |  |  |  |
|   - Location | 0% | (20%) | (10%) | 30% |
|   - Size | 30% | 0% | 10% | 0% |
|   - Site | 0% | 40% | 0% | 0% |
|   - Motivation | 0% | 0% | 20% | 0% |
|   - Time | 0% | 0% | 0% | 0% |
| Total Adjustment | 30% | 20% | 20% | 30% |
| Adjusted Price |  |  |  |  |
|   Per Acre | $2,600 | $6,173 | $4,064 | $2,682 |

We give less weight to TA4 because it was a listing rather than a completed sale. Based upon our review of all the valuation evidence, giving due consideration to our observation at trial of the witnesses for both parties and considering their testimony and the expert reports, we conclude that the parcel of 30.3 acres was worth $4,000 per acre for a total value of $121,200.

D. <u>Conclusion</u>

We have found the fair market values of the 11.656 acres, the Litton building, and the parcel of 30.3 acres on December 17, 1992, to be $142,164, $723,225, and $121,200, respectively.

Therefore the total value of the gifted Litton property on December 17, 1992, was $986,589.

V.  Fair Market Value of the Bates Center

Mr. Cantrell determined the fair market value of the Bates Center on December 23, 1992, to be $350,000.  His report found that the value indicated by the cost approach was $379,000, and the value indicated by the sales comparison method was $342,000. Mr. Cantrell placed greater weight on the cost approach in determining his final estimate of the Bates Center's fair market value.

We note that we are skeptical of the accuracy of Mr. Cantrell's conclusion regarding the value of the Bates Center on its date of donation.  First, one of his basic premises--the date of donation of the Bates Center--is wrong.[11]  Second, he places greater weight on a method of valuation--the cost approach--that we have found not helpful in this case.  Last, he contradicted himself regarding his basis for valuing the Bates Center--he testified that he computed the value of the Bates Center based on its possibility of development into a commercial property because he assumed that the land, which was zoned R-2 residential with a church variance, could easily be rezoned as commercial;[12]

---

[11]  Mr. Sessions donated the Bates Center on Sept. 23, 1992, not on Dec. 23, 1992.

[12]  We note that Mr. Sessions never took any action to have the Bates Center land rezoned by the City of Lubbock. Furthermore, although petitioners point to a letter from Randy Henson, Senior Planner, Lubbock Planning Department, that

(continued...)

however, in his report he concluded that the highest and best use for the Bates Center was for use in conjunction with the adjoining church property and that the Bates Center's location made commercial uses not feasible.

Dr. Friedman determined the fair market value of the Bates Center on September 23, 1992, to be $170,000. Dr. Friedman placed greater weight on the sales comparison method in determining his final estimate of the Bates Center's fair market value.

A.  Bates Center Land

Under the sales comparison method, Mr. Cantrell determined the fair market value of the Bates Center land (which was 50,507 square feet) to be $177,000 based on a value of $3.50 per square foot. Under the sales comparison method, Dr. Friedman determined the fair market value of the Bates Center land to be $45,000 based on a value of $1 per square foot for the five lots, which comprised 39,298 square feet, and $0.43 per square foot for the excess lot, which was 11,209 square feet.

Mr. Cantrell compared the Bates Center land to five other comparables which were as follows:

---

[12](...continued)
indicated that the zoning of the Bates Center could be changed, petitioners did not call him as a witness. We infer that his testimony would not have been favorable to petitioners. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

| Land | Sale Date | Land Size (Sq. Ft.) | Price Per Sq. Ft. |
|------|-----------|---------------------|-------------------|
| BL1 | 12/85 | 9,249 | $4.87 |
| BL2 | 12/87 | 18,900 | 2.65 |
| BL3 | 2/88 | 6,758 | 3.26 |
| BL4 | 5/92 | 8,793 | 5.69 |
| BL5 | 10/92 | 21,000 | 3.81 |

Dr. Friedman compared the Bates Center land to two of these same five comparables (BL1 and BL4).

Dr. Friedman also compared the Bates Center land to four tax comparables. These tax comparables, however, were not for sale, and the price per square foot was based on the assessed value of the land.[13]

Although the tax comparables may provide some insight into the value of the Bates Center land, we instead choose to rely on the completed sales listed above (BL1 through BL5). The completed sales were located near the Bates Center, and some took place close to the time of its donation. We believe that, in this case, they are better indicators of the value of the Bates Center land at the time of its donation.

BL1, BL2, BL4, and BL5 were located on a six-lane, heavily traveled road (Avenue Q). Dr. Friedman made a negative adjustment of 50 percent for this factor; Mr. Cantrell, however, made negative adjustments of 5 percent to BL2 and BL5 and negative adjustments of 10 percent to BL1 and BL4 based on their location. BL3 was located on 44th Street; however, it was located closer to Avenue Q than the Bates Center property. We

---

[13] The Texas Property Tax Code and the Texas Constitution require the LCAD to appraise property at fair market value. See Tex. Const. art. VIII, sec. 20; Tex. Tax Code Ann. secs. 1.04(7), 23.01 (West 1992).

are more persuaded by Dr. Friedman's adjustment for the better location of the comparables, and we shall apply negative adjustments of 40 percent to BL1, BL2, BL4, and BL5 and a negative adjustment of 10 percent to BL3 for location in order to determine the value of the Bates Center land.

Dr. Friedman adjusted the comparables for size and zoning. He applied negative size adjustments of 10 percent to the properties he used as comparables (BL1 and BL4) because they were smaller than the Bates Center property. He also applied negative zoning adjustments of 20 percent to these properties because they were zoned C-4 (commercial) and the Bates Center land was zoned R-2 with a church variance. We are convinced that these adjustments are reasonable and shall apply negative adjustments of 10 percent to all the comparables due to their smaller size and shall apply negative adjustments of 20 percent to BL1, BL4, and BL5 because they were zoned C-4 (commercial) in order to determine the value of the Bates Center land. BL2 and BL3 were zoned R-3 and R-2, respectively, at the time of their sales; therefore, we conclude that they require no adjustment for zoning.

Mr. Cantrell adjusted all of the comparables under "other". Mr. Cantrell, however, only explained the "other" adjustment as it related to BL1 and BL2--he made the adjustments in order to adjust for the motivations of the seller/buyer. We are convinced that the adjustments for motivation of seller/buyer are well

founded and shall apply a positive adjustment to BL2 of 10 percent and a negative adjustment to BL1 of 10 percent. We are unconvinced, however, by Mr. Cantrell's unexplained "other" adjustments to BL3, BL4, and BL5 and shall not apply Mr. Cantrell's proposed "other" adjustments to these properties in order to determine the fair market value of the Bates Center property.

After applying the adjustments as we find proper to the comparables, the adjusted price per square foot for the five comparables is as follows:

|  | BL1 | BL2 | BL3 | BL4 | BL5 |
|---|---|---|---|---|---|
| Price Per Square Foot | $4.87 | $2.65 | $3.26 | $5.69 | $3.81 |
| Adjustments |  |  |  |  |  |
| - Location | (40%) | (40%) | (10%) | (40%) | (40%) |
| - Size | (10%) | (10%) | (10%) | (10%) | (10%) |
| - Zoning | (20%) | 0% | 0% | (20%) | (20%) |
| - Other | (10%) | 10% | 0% | 0% | 0% |
| Total Adjustment | (80%) | (40%) | (20%) | (70%) | (70%) |
| Adjusted Price Per Square Foot | $0.97 | $1.59 | $2.61 | $1.71 | $1.14 |

Based upon our review of all the valuation evidence, giving due consideration to our observation at trial of the witnesses for both parties and considering their testimony and the expert reports, we conclude that the Litton building was worth $1.60 per square foot for a total value of $80,811.

B.   Bates Center Building

Under the sales comparison method, Mr. Cantrell determined the fair market value of the Bates Center property, which was 10,022 square feet, to be $165,363 based on a value of $16.50 per square foot. Under the sales comparison method, Dr. Friedman

determined the fair market value of the Bates Center building to be $125,000 based on a value of $12.48 per square foot.

Mr. Cantrell compared the Bates Center building to five other churches that were sold in Lubbock between January of 1989 and September of 1992. He made no adjustments to these sales prices. He determined that the sales price per square foot for these buildings ranged from $6.01 to $26.46. He removed the low and high sales prices and was left with sales prices of $10.82, $13.95 (the adjoining church), and $18.74 per square foot. He determined that $16.50 per square foot was the most reasonable value estimate based on these three sales.

Dr. Friedman compared the Bates Center building to four other churches that were sold in Lubbock between January of 1989 and September of 1992. Three of these four sales were comparables that Mr. Cantrell used in his report. He determined that the sales price per square foot for the buildings he compared the Bates Center building to ranged from $12.06 to $20.47. He determined that the sales price for the adjoining church building was $16.70 per square foot.

Dr. Friedman calculated that the average unadjusted sale price for the buildings was $15.60 per square foot. He adjusted this average price downward by 20 percent because he believed that the motivation to purchase a church building was stronger than to purchase an activities building. He determined the adjusted price per square foot to be $12.48.

We are not convinced that the comparable properties required a negative adjustment for motivation. Bishop William H. Watson testified that some churches in Lubbock started in a gymnasium without a sanctuary. Bishop Watson testified, "I had made up my mind if I had to take just the gym only, I would stay in the gym as the church because I see some other churches do that kind of thing." As we previously stated, the use of the Bates Center as a stand-alone church is supported by the record. We shall not apply a negative adjustment for motivation in determining the value of the Bates Center building.

Furthermore, we believe that the sale of the adjoining church, which Mr. Sessions sold to the Northwest Texas Church of God in Christ--to which he donated the Bates Center--is particularly relevant to our determination of the value of the Bates Center building. The sales price of the adjoining church was $550,000 with the building costing $13.95 per square foot according to Mr. Cantrell or $16.70 per square foot according to Dr. Friedman.

Bishop Watson testified that he felt that the church building was more important than the Bates Center. He also testified that Mr. Sessions offered to sell the Bates Center and the adjoining church together to the Northwest Texas Church of God in Christ for $750,000. After negotiations, the Northwest Texas Church of God in Christ purchased the adjoining church for

$550,000, and Mr. Sessions donated the Bates Center to the Northwest Texas Church of God in Christ.

Based upon our review of all the valuation evidence, giving due consideration to our observation at trial of the witnesses for both parties and considering their testimony and the expert reports, we conclude that the Bates Center building was worth $15.60 per square foot for a total value of $156,343.

C.   Conclusion

We have found the fair market values of the Bates Center land and Bates Center building on September 23, 1992, to be $80,811 and $156,343, respectively.  Therefore, the total value of the Bates Center on September 23, 1992, was $237,154.

To reflect the foregoing,

Decisions will be entered
under Rule 155.